JOSEPH S. SMITH, trading as J. SMITH & SON *vs*. WILLIAM F. TOWERS, Garnishee of GAREY & MILLINGTON.

*Trust—Construction—Restriction on Alienation—Trust fund not Liable for Payment of Debts of Cestui que trust.*

Where a testator devises real estate in trust, the trustee to collect the rents and profits, and to pay the same to the testator's son, "into his own hands, and not into another, whether claiming by his authority, or otherwise," the intention of the testator is that the income shall be paid into the hands of his son, to the exclusion of all other persons, whether claiming as alienees or as creditors; and such rents and profits while in the hands of the trustee, cannot be reached by the creditors of the *cestui que trust* by any process either at law or in equity.

APPEAL from the Circuit Court for Caroline County.

On the 15th of April, 1870, the appellant recovered judgment against Robert J. W. Garey and George Millington, trading as Garey & Millington, for $1188.51, and interest and costs.  In May, 1886, Thomas F. Garey, the father of Robert J. W. Garey, died leaving a will, in which he devised certain real estate to one John Robert Fountain as trustee, in trust for the following purposes, to wit:  "That he shall pay, or cause to be paid unto my dear son, Robert J. W. Garey, as the same may accrue, the net rents, income and profits arising from said farm and property, after deducting such sums of money as may be necessary to satisfy and pay taxes and assessments levied thereon, and needful repairs to buildings and fencing,  *   *   *   *   the said net rents, income and profits to be paid to the said Robert J. W. Garey, (into his own hands, and not into another, whether claiming by his authority or otherwise,) so long as he, the said Robert J. W. Garey, shall live," &c.; then in trust to convey the same in fee simple to the children or descendants of said Robert, &c. The said Fountain, trustee, being dead, under proper proceedings had in the Circuit Court for Caroline County, in equity, William F. Towers, was, by the decree of said Court, appointed trustee in the place of Fountain, to take and hold said farm and property in trust, and discharge said trust; and he duly qualified as such trustee, as required by said decree.   On the 8th of June, 1887, an attachment was issued by way of execution, and laid in the hands of William F. Towers, trustee, to affect funds which he held under the will of Thomas F. Garey in trust for Robert J. W. Garey one of the judgment debtors.   An agreed statement of facts was filed in the case, and it was agreed that a *pro forma* judgment should be entered for the defendant, with the right of appeal reserved to the plaintiff.   The plaintiff accordingly took this appeal.

The cause was argued before ALVEY, C. J., MILLER, ROBINSON, IRVING, BRYAN, and MCSHERRY, J.

*William S. Bryan, Jr.*, for the appellant.

Will the law permit a person, not a married woman, but adult and *sui juris*, to enjoy a life estate in property that his creditors cannot reach, when there is no limitation over in case of his bankruptcy, or on the issuing of an execution against him? If the law will suffer property to be so held, do the terms of Thomas F. Garey's will create such an estate in Robert J. W. Garey?

"The current of the law has for centuries, been in favor of the removal of old restraints on alienation; in favor of the disallowance of new ones; and especially in favor of compelling a debtor to apply to his debts all property which he could use for himself, or give at his pleasure to others. The Legislatures and the Courts have co-operated to this end." *Gray on Restraints on Alienation*, sec. 4.

"It is wholly against the policy of the law to allow property, whether legal or equitable, to be fettered by restraints upon alienation, and generally whenever property is subject to alienation by the owner it is subject to his debts." *Warner vs. Rice*, 66 *Md.*, 440.

The English doctrine is settled, that in the case of a bequest to a person not a *féme covert* but *sui juris*, the restraint on alienation, or the declaration that the property shall be held free from all claims of debtors of the donee or devisee, is simply void where there is no limitation over—being repugnant to the estate granted. *Brandon vs. Robinson*, 18 *Vesey*, 429; *Rochford vs. Hackman*, 9 *Hare*, 480; *Graves vs. Dolphin*, 1 *Sim.*, 66; *Green vs. Spicer*, 1 *Russ. and M.*, 395; *Wallace vs. Anderson*, 16 *Beav.*, 536; See *Younghusband vs. Gisborne*, 1 *Collier*, 400; *Tillinghast vs. Bradford*, 5 *R. I.*, 202.

Mr. Justice CLIFFORD in delivering the opinion in *Nichol vs. Levy,* 5 *Wallace,* 441, said : "It is a settled rule of law, that the beneficial interest of a *cestui que trust,* whatever it may be, is liable for the payment of his debts.   It cannot be so fenced about by inhibitions and restrictions, as to secure to it the inconsistent characteristics of right and enjoyment to the beneficiary and immunity from his creditors.  See also *Sanford vs. Lackland,* 2 *Dillon,* 10.

In the Courts of Rhode Island, New York, North Carolina, South Carolina, Georgia, Alabama, Tennessee, and Ohio, the decisions are *uniformly* against the validity of spendthrift trusts.  See—*Tillinghast vs. Bradford,* 5 *R. I.,* 205 ; *Dick vs. Pitchford,* 1 *Dev. & Bat. Eq.,* 480 ; *Pace vs. Pace,* 73 *N. C.,* 119 ; *Heath vs. Bishop,* 4 *Rich. Eq.,* 46 ; *Kempton vs. Hallowell,* 24 *Ga.,* 52 ; *Bailie vs. McWhorter,* 56 *Ga.,* 183 ; *Rugley vs. Robinson,* 10 *Ala.,* 702 ; *Jones vs. Reese,* 65 *Ala.,* 134 ; *Hooberry vs. Harding,* 10 *Lea,* 392 ; *Wallace vs. Smith,* 2 *Handy,* 79 ; *Hobbs vs. Smith,* 15 *Ohio State,* 419 ; See *Bryan vs. Knickerbocker,* 1 *Barb. Ch.,* 409 ; *Rome Exchange Bank vs. Eames,* 4 *Abbott Ct. of App.,* 99 ; *Hardenburgh vs. Blair,* 3 *Stew.,* 42 ; *McIlvaine vs. Smith,* 42 *Missouri,* 45 ; *Lackland vs. Smith,* 5 *Mo. App.,* 153 ; *Lindsay vs. Harrison,* 8 *Arkansas,* 302 ; *Bridge vs. Ward,* 35 *Wis.,* 687 ; *Easterly vs. Keney,* 36 *Conn.,* 18.

If a spendthrift trust can be lawfully created, does this will create one ?   As even in Pennsylvania these trusts are declared to be only tolerated and not approved, it must of course be very clear from the words of the will that the testator intended to create such a trust before the legatee will be upheld in refusing to pay his debts.    *Sparhawk vs. Cloon,* 125 *Mass.,* 263 ; *Palmer vs. Stevens,* 15 *Gray,* 343 ; *Knefler vs. Shreve,* 78 *Ky.,* 303 ; *Younghusband vs. Gisborne,* 1 *Collier,* 400 ; *Wallace vs. Smith,* 2 *Handy,* 79 ; *Tyler vs. Lake,* 4 *Sim.,*

Smith & Son *vs.* Towers, Garnishee.

44, *Same Case on Appeal*, 2 *Russ. & Mylne*, 183; *Bach-low vs. Laws*, 2 *Hare*, 49.

* *Robert J. Jump, Joshua W. Bryant*, and *Edwin H. Brown*, for the appellee.

Was it the intention of the testator, Thos. F. Garey, by the devise in the second item of his will, that said "net income, rents and profits," during the life of Robert, should not be liable for or subject to the claims of Robert's creditors? And if so, are the terms and provisions of said devise, and the trust thereby created, effectual for such a purpose? That such was the intention of the testator we think is manifest from the very terms of the devise. He creates a valid trust and places the legal estate, which is usually subject to legal process, in the trustee. He imposes upon the trustee various duties in the use of the income, &c., and among these directs that the "net rents, income and profits," be paid to said Robert, "into his own hands and not into another, whether claiming by his authority or otherwise." The mode and manner of paying the net income, &c., are as much a part of the duties of the trust, as paying taxes and assessments, and furnishing needful repairs and the lime. He is not only directed to pay into Robert's own hands, but he is expressly prohibited from paying into the hands of anyone else. It is to go into his hands and be subject to his voluntary disposition. It is then his absolute property. Such a payment, if obligatory on the trustee, prevents any creditor from reaching it by legal process. And to require such, is to manifest such an intention. If a creditor by process can take the funds, the trust will be defeated, and they will not be paid into Robert's hands.

[*] Although present, Mr. Jump took no part in the argument.

·But if such be the testator's intention, does the devise in question effectuate it? It is claimed to be repugnant to the English doctrine, which would in certain contingencies subject the interest of the *cestui que trust* to the claims of creditors. But this doctrine should not prevail here. It does not rest upon or arise from common law principles, but exists solely by virtue of statutes.

In England, equitable estates are made subject to the debts of the *cestui que trust* by force of statutes to that effect, though not originally so liable. *Washburn on Real Prop., Book* 2, *marg. p.* 183, *sec.* 32.

This English doctrine requires that the devise shall provide for a cesser of the interest, or a limitation over, in case of bankruptcy or insolvency of the *cestui que trust*, or that his interest shall go to his assignee for creditors. It is found alone in cases of bankruptcy or insolvency, and has been the outgrowth of the statutes on those subjects. It is harsh and severe, and while not benefiting the creditor, despoils the *cestui que trust*, and misappropriates the bounty of the testator.

It should not prevail here unless the principles of those statutes are to be made operative by judicial construction. For in England "the whole of the lands are now liable to be absolutely sold for the benefit of trade and commerce by the several statutes of bankruptcy." 2 *Blackstone, marg. p.* 290; *Barnett's Appeal,* 10 *Wright,* 399.

The doctrine recognized in this country in cases like the present is, that an estate may be limited in trust for a debtor, so that it shall be free from *involuntary* alienation at the suit of his creditors, whether the instrument does or does not contain a limitation over, or cesser of the estate, upon such an event. As such a settlement in a legal or technical sense is no restraint upon alienation, but a sale or alienation would be a breach of the trust, and renders it impossible for the trus-

tee to perform his duties. *Fisher vs. Taylor*, 2 *Rawle*, 33; *Ashurst vs. Given*, 5 *Watts & S.*, 323; *Holdship vs. Patterson*, 7 *Watts*, 547; *Norris vs. Johnston*, 5 *Burr*, 289; *Eyrick vs. Hetrick*, 1 *Harris*, 491; *Barnett's Appeal*, 46 *Penn.*, 392; *Shankland's Appeal*, 47 *Penn.*, 113; *Leavitt vs. Beirne*, 21 *Conn.*, 8; *Pope vs. Elliott*, 8 *B. Monroe*, 56; *Rowan vs. Rowan*, 2 *Duvall*, 412; *Hill vs. McRae*, 27 *Ala.*, 175; *Vaux vs. Parke*, 7 *Watts & S.*, 19; *Rife vs. Geyer*, 59 *Pa.*, 393; *White vs. White*, 30 *Vt.*, 342.

The power of alienation is not a necessary incident to an equitable estate for life, and the owner of property may, in the free exercise of his bounty, so dispose of it as to secure its enjoyment to the objects of his bounty without making it alienable by them or liable for their debts, and this intention, clearly expressed by the founder of a trust, must be carried out by the Courts. *Nichols vs. Eaton*, 91 *U. S.*, 716; *Hyde vs. Wood*, 94 *U. S.*, 523; *Brown vs. Williamson*, 36 *Pa.*, 338; *Still vs. Spear*, 45 *Pa.*, 168; *Campbell vs. Foster*, 35 *N. Y.*, 361.

ROBINSON, J., delivered the opinion of the Court.

The testator devised certain real estate to his friend John R. Fountain in trust to collect the rents and profits, and to pay the same to his son Robert, "*into his own hands, and not into another, whether claiming by his authority or otherwise*," and upon his death to convey said real estate to such children of his son Robert as may be living at the time of his death.

Upon the construction of this clause of the testator's will two questions arise: First, did the testator mean to give the income of the property to his son to the exclusion of his creditors, and secondly, if so are the terms and provisions of the will effectual to carry out this intention. There can be no difficulty whatever as

to the first point. He not only gives the legal estate to the trustee, but he directs in express terms that he shall pay the income into the hands of his son and not into the hands of any other person, whether claiming by his authority, or in any other capacity. Here then, is an express provision, that the income shall be paid to his son, and an express prohibition against paying it to any other person. If the income in the hands of the trustee is liable to the claims of creditors, the trustee it is plain could not carry out the trust. So construing this will as we do, and it is not we think susceptible of any other construction, the testator meant beyond all question that the income should be paid into the hands of his son, to the the exclusion of all other persons, whether claiming as alienees or as creditors.

The next point, is one of more than ordinary importance, and has not heretofore been decided by this Court. A great deal may be said on both sides, and the question is not free of difficulty. In England the decisions are all one way, and it is well settled there, that the devise of an *equitable estate or interest for* life to any person, other than a married woman, carries with it, as a necessary incident to such estate or interest, the right of alienation by the *cestui que trust,* and is liable for the payment of his debts, and no provision by way of inhibition or otherwise, which does not operate as a *cesser* or *limitation* over of the estate, can protect it against the claims of creditors. *Brandon vs. Robinson,* 18 *Ves.,* 429; *Rochford vs. Hackman,* 9 *Hare,* 480; *Graves vs. Dolphin,* 1 *Sim.,* 66; *Green vs. Spicer,* 1 *Russ. & Myl.,* 395; *Younghusband vs. Gisborne,* 1 *Collyer,* 400.

In this country, however, the decisions are conflicting, and the Supreme Court of the United States, and the Supreme Courts of other States, have, after full consideration of the English cases, held, that the power of

Smith & Son *vs.* Towers, Garnishee.

alienation is not a necessary incident to an equitable estate for life, and that the owner of property may, in the free exercise of his bounty, so dispose of it as to secure its enjoyment to his beneficiary, without making it alienable by him, or liable in any manner for his debts, and that such an intention when clearly expressed by the founder of the trust, must be respected by the Courts. The Supreme Court after reviewing the English decisions, in an able opinion by Justice MILLER, say:

"But the doctrine, that the owner of property in the free exercise of his will in disposing of it, cannot so dispose of it, but that the object of his bounty, who parts with nothing in return, must hold it subject to the debts due his creditors, though that may soon deprive him of all the benefit sought to be conferred by the testator's affection or generosity, is one which we are not prepared to announce as the doctrine of this Court. * * * Nor do we see any reason, in the recognized nature and tenure of property and its transfer by will, why a testator who *gives*, without any pecuniary return, who gets nothing of property value from the donee, may not attach to that gift, the incident of continued use, of uninterrupted benefit of the gift, during the life of the donee." *Nichols, Assignee vs. Eaton, et al.*, 91 *U. S.*, 725, 727.

And in the still later case of *Broadway National Bank vs. Adams*, 133 *Mass.*, 170, argued in June, 1881, and re-argued in March, 1882, the Court unanimously held, that property may be conveyed in trust, with the provision that the income shall not be alienated by the beneficiary by anticipation, or be subject to be taken by his creditors in advance of its payment to him, although there is no cesser or limitation over of the estate in such an event. MORTON, C. J., says: "We are not able to see that it would violate any

principles of sound public policy to permit a testator to give to the object of his bounty such a qualified interest in the income of a trust fund, and thus provide against the improvidence or misfortune of the beneficiary. * * * * Under our system, creditors may reach all the property of the debtor not exempt by law, but they cannot enlarge the gift of the founder of a. trust, and take more than he has given."

And then again in *Rife vs. Geyer,* 59 *Penn.,* 393, Judge SHARSWOOD speaking for the Court says: "That a benefactor has the power of thus restricting the enjoyment of his bounty through the medium of a trust during the life of the beneficiary is now the unquestionable law of this State." In *Shankland's Appeal,* 11 *Wright,* 113, the point was expressly decided, and it was there held that a trust to collect and receive rents. and pay over the same to a son of the testatrix for and during the term of his natural life, without being subject to his debts and liabilities was an active one, and that the legal estate was vested in the trustee, and no act of the *cestui que trust* could deprive him of it, or allow him to interfere with the collection of the income, and no creditor could touch the income or any interest. which the *cestui que trust* had in it.

In Vermont, Connecticut and Kentucky, the highest Courts have held that the income of property may be devised in trust for the benefit of the *cestui que trust* for life to the exclusion of the claims of his creditors. *Ex'rs of White vs. White,* 30 *Vert.,* 338; *Leavitt vs. Beirne,* 21 *Conn.;* 1; *Pope's Ex'rs vs. Elliott,* 8 *B. Mon.,* 56.

In other States, however, and it may be said in the majority of the States where the question has arisen, the English rule has been adopted without qualification. *Tillinghast vs. Bradford,* 5 *R. I.,* 205; *Dick vs. Pitchford,* 1 *Dev. & Batt. Eq.,* 480; *Heath vs. Bishop,* 4.

*Rich. Eq.*, 46; *Bailie vs. McWhorter*, 56 *Ga.*, 183; *Rugely and Harrison vs. Robinson*, 10 *Ala.*, 702.

In this State there is no decision to govern us, and with conflicting decisions in other Courts entitled to the highest consideration, the question is one after all to be determined by us on principle. The English decisions rest on two grounds, first, that the right of alienation is a necessary incident to an equitable estate for life, and any restraint upon this right is against the policy of the law which favors the ready alienation of property; and secondly, that public policy forbids that one should have the right to enjoy the income of property, to the exclusion of his creditors. Now the right to sell and dispose of property, is a necessary incident of course to the absolute ownership of such property. You cannot give to one a fee simple interest, and then say he shall not sell or dispose of it, because the right to alien it, is a legal and necessary incident to the estate granted, and to impose such a condition would be repugnant to the nature and tenure of the estate itself. And besides the best interests of the public require that there should be a ready transmission of property. But the reasons on which the rule is founded do not apply to the transfer of property in trust. Where by the terms of the trust, the legal estate is vested in a trustee he takes the legal title with the necessary incidents attached to it, and among such incidents is the right to alien it. The *cestui que trust* takes the equitable estate with the right to the accrued income, and when this has been paid to him, the absolute right to dispose of it. So neither the principal, nor the income can be said to be inalienable. And besides, the policy of the law is not against all restraints on the absolute right to dispose of it. You may give one an estate for life, with a provision that the estate shall go over to a third person upon aliena-

tion voluntary or involuntary, by the life tenant. You cannot give property to be held in perpetuity, but you may give one an estate for life, with a limitation over to lives in being, and twenty-one years thereafter. And so by the English rule you may give an equitable estate for life, with a limitation over or a cesser to a third person, should the life tenant attempt to alien it. Now in all these instances, there is a restraint to a greater or less degree on the right of alienation. The law does not therefore forbid all and any restraints on the right to dispose of it, but only such restraints as may be deemed against the best interests of the community. And the gift of an equitable right to the income from property for the life of the beneficiary, to the exclusion of his alienee, is not, in our opinion, repugnant to the estate or interest granted, nor is it such a restraint on the right of alienation as the law for reasons of public policy forbids.

And then as to the other ground, that it is against the policy of the law to permit one to hold and enjoy an estate or interest in property for life, whether legal or equitable, to the exclusion of his creditors. Now common honesty requires, of course, that every one should pay his debts, and the policy of the law for centuries has been to subject the property of a debtor of every kind which he holds in his own right, to the payment of his debts. He has as owner of such property the right to dispose of it as he pleases, and his interest is, therefore, liable for the payment of his debts. But a *cestui que trust* does not hold the estate or interest in his own right; he has but an equitable and qualified right to the property or to its income, to be held and enjoyed by the beneficiary on certain terms and conditions prescribed by the founder of the trust. The legal title is in the trustee, and the *cestui que trust* derives his title to the income through the instrument by which

the trust is created.  The donor or devisor, as the ab-
solute owner of the property, has the right to prescribe
the terms on which his bounty shall be enjoyed, unless
such terms be repugnant to the law.  And it is no answer
to say that the gift of an equitable right to income to
the exclusion of creditors is against the policy of the
law.  This is begging the question.  Why is it against
the policy of the law? what sound principle does it vio-
late?  The creditors of the beneficiary have no right
to complain, because the founder of the trust did not
give his bounty to them.  And if so, what grounds
have they to complain because he has seen proper to
give it in trust to be received by the trustee and to be
paid to another, and not to be liable while in the
hands of the trustee to the creditors of the *cestui que
trust.*  All deeds and wills and other instruments by
which such trusts are created, are required by law to
be recorded in the public offices, and creditors have
notice of the terms and conditions on which the bene-
ficiary is entitled to the income of the property.  They
know that the founder of the trust has declared that
this income shall be paid to the object of his bounty to
the exclusion of creditors, and if under such circum-
stances they see proper to give credit to one who has
but an equitable and qualified right to the enjoyment
of property, they do so with their eyes open.  It can-
not be said that credit was given upon such a qualified
right to the enjoyment of the income of property, or
that creditors have been deceived or mislead; and if
the beneficiary is dishonest enough not to apply the
income when received by him to the payment of his
debts, creditors have no right to complain because they
cannot subject it in the hands of the trustee to the
payment of their claims, against the express terms of
the trust.  The hardship to them is one that will
surely bring about its own remedy, for the dishonest

beneficiary it is plain would soon be without credit. And then, as to the rights of creditors, these may be defeated even according to the English decisions, by providing that in the event of the recovery of a judgment against the *cestui que trust*, or upon his insolvency, his interest in the property shall cease, and shall go to another. Now what advantage to the creditor is the cesser or limitation over? What he wants is the money due to him, and this is not paid by depriving the beneficiary of the property. But it may be said, that sooner than lose his interest in the property, self-interest, if no higher consideration, will prompt him to pay his debts. There is force in this, but with the best intentions any one may by the chances and hazards incident to every pursuit in life, be unable to pay his debts, and in that event by depriving one of his property by limitation over to a third person, you may deprive him of the very means by which he might in the future repair his fortune. So it does not seem to us there is any substantial advantage to the creditor, in thus permitting the founder of the trust to do that indirectly, which we think he can do directly. And then again, by the English rule the rights of creditors may be excluded by providing that the income may be paid or not to the beneficiary at the option of the trustee. To impose a requirement, so harsh in itself, upon the bounty of a donor or devisor who may desire to provide for the certain support of the object of his bounty is not warranted, it seems to us, by any principle of justice or sound public policy. And a rule of law which requires this to be done, and one which may be evaded by carefully drawn terms and provisions, is hardly worth preserving. Upon principle, therefore, we are of opinion, that the founder of a trust may provide in direct terms that his property shall go to his beneficiary to the exclusion of his alienees, and to the

exclusion of his creditors.   This being so, the rents and profits in the hands of the trustee, and which the testator in the will before us directs shall be paid into the hands of his son, Robert, and "not into the hands of another, whether claiming by his authority or other-wise," cannot, in our opinion, be reached by his creditors by any process, either at law or in equity, before such rents and profits are paid to him.

*Judgment affirmed.*

(Decided 12th June, 1888.)


ALVEY, C. J., filed the following dissenting opinion in which BRYAN, J., concurred:

I am quite aware that dissenting opinions are often regarded as useless and ungracious work; but, with my settled convictions in regard to the principles involved in this case, I cannot do otherwise than enter my dissent from the opinion of the majority of the Court; and I think it proper to state the reasons of that dissent.

This is an attachment proceeding instituted to reach and subject to condemnation the rights and interest of Robert J. W. Garey, the debtor, accruing under his father's will,—such interest being in the hands of a trustee, in whom the legal estate in the land is vested, and whose duty it is, by the terms of the will, to receive and pay over the annual rents and profits of the estate to the son for life.   This right and estate of the son is limited by the testator, thus:   "That he [the trustee] shall pay or cause to be paid unto my son, Robert J. W. Garey, as the same may accrue, the net rents, income and profits arising from said farm and property, after deducting such sums of money as may be necessary to satisfy and pay the taxes and assessments levied thereon, and needful repairs to buildings

and fencing, and also a sum sufficient to purchase fifteen hundred bushels of lime during each year for the space of twelve years, to be applied to the fields of said farm as they are cultivated in corn; the said net rents, income and profits to be paid to the said Robert J. W. Garey, (into his own hands, and not into another, whether claiming by his authority or otherwise,) so long as he, the said Robert J. W. Garey, shall live; and from and after the death of him, the said Robert J. W. Garey, then, in trust," &c.

It is insisted, on the part of the debtor, the devisee for life, that the right and estate devised to him, by the clause of the will just quoted, cannot be made liable to the payment of his debts, and that he is entitled to receive and enjoy the rents and income of the estate for his life, in utter defiance of all effort by his creditors to reach such rents and income by legal process. And this contention is fully sustained by the opinion of the majority of this Court, but to which I cannot for a moment assent.

Upon the contention of the debtor, the beneficial devisee for life, two questions arise: 1st, Whether the testator, by devising the legal estate to a trustee, with directions to pay over the rents and profits to the son for life, could lawfully impose a restriction upon the ordinary right of alienation of such equitable life estate, or protect such estate from all liability for the debts of the son, without any cesser of the estate devised; and, 2ndly, whether, if the testator had such right, he has effectually exercised the same, by the terms employed in the will.

1. As will be observed, there is no cesser or termination of the estate provided for, in respect to the devise to the son, in the event of attempted alienation, or seizure by creditors. The rents and profits of the farm are simply directed to be paid over to the son him-

self for life, and no alternative or contingent disposition is made of them whatever.    There is certainly, as observed by Lord ELDON, in *Brandon vs. Robinson*, 18 *Ves.*, 432, an obvious distinction between a disposition to a man, until he becomes bankrupt, and then over, and an attempt to give him property, and to prevent his creditors from obtaining an interest in it, though it is his absolutely for life or in fee.

I had supposed that if there was any principle well settled in the law of property, it was that upon any gift or grant of a beneficial fee simple or life estate, whether legal or equitable, there was an incident pertaining to such estates that could not be severed, and that was the right and power of the donee or grantee to alienate the estate, and to charge it with his debts.    And that any attempt to restrain the exercise of such right and power, except by way of cesser or limitation over of the estate, would be regarded as repugnant to the estate, and therefore without effect.    This is certainly the well established doctrine in that system of jurisprudence from which we derive both the principles of the common law as applied here, and the principles and doctrine of trusts as applied and enforced by our Courts of Chancery.    And it is an undeniable proposition that, as a general rule, Courts of equity, in regard to trust estates, adopt the rules of law which are applicable to legal estates; or, in other words, in regard to trusts, the analogy to estates at the common law is not only followed, as to the rights and interests of the *cestui que trust*, but also as to the remedies to enforce, preserve, and extinguish those rights and interests.    1 *Sand., Uses & Trusts*, 269; 2 *Sto. Eq. Juris.*, secs. 974 *a*, 975. According to the rule of the English law, therefore, whatever rights in property a man may acquire and hold beneficially, whether legal or equitable, he may alienate; and it is equally clear that whatever a man

can demand of his trustee his creditors may demand of him. And this is upon the plainest principles of morality and common honesty, as well as upon reason and a sound public policy.

As I have already stated, there is no reverter to the estate of the testator, or limitation over, upon any attempted alienation, or seizure of the interest of the devisee for life, by creditors. But it is supposed that the interest of the devisee for life is effectually hedged against his creditors by the simple direction that the rents and income should be paid *"into his own hands, and not into another, whether claiming by his authority or otherwise."* To such contention I cannot assent.

The whole theory and history of the English law is against such contention. In *Coke upon Littleton, page* 223a, *Sir Edward Coke, in his commentary upon sect.* 360 *of Littleton,* which treats of conditions against alienations as being void, says: "The like law is of a devise in fee upon condition that the devisee shall not alien; the condition is void; and so it is of a grant, release, confirmation, or any other conveyance, whereby a fee simple doth pass. For it is absurd and repugnant to reason that he, *that hath no possibility to have the land revert to him,* should restrain his feoffee in fee simple of all his power to alien. And so it is if a man be possessed of a lease for years, or of a horse, or of any other chattel, real or personale, and give or sell his whole interest or propertie therein, upon condition that the donee or vendee shall not alien the same, the same is void, because his whole interest and propertie is out of him, so as he hath no possibilitie of a reverter; and it is against trade and traffique, and bargaining and contracting between man and man." And in *Butler's note to the Commentary on the next section of Little-ton,* it is said, that "A power of suffering a common recovery, and of levying a fine within the Statute of 4

Smith & Son *vs.* Towers, Garnishee.

*Hen.* 7, and 32 *Hen.* 8, is so inseparably inherent to the estate of a tenant in tail, that any condition or proviso restraining or prohibiting it, is held to be repugnant to the nature of the estate, and therefore void.''

Such then being the well settled and established principle in respect to the grant or devise of estates in fee simple or fee tail, (and this I do not understand to be anywhere controverted,) why should there be a different principle applicable to estates for life? The reason of the principle against restraint of alienation and liability for debts, is the repugnancy of such restraint to the ordinary rights of property, and that property would thereby be withdrawn from the ordinary rules and channels of commerce and traffic among men. Why should a life estate, either legal or equitable, be tied up and fettered, it may be, for the greater part of a century, when the restraint upon alienation, either voluntary or by process of law, of an estate in fee or fee tail will not be tolerated at all? The English Courts have consistently and steadily refused to recognize any such distinction, but treat the right of alienation and liability for debts as inseparable incidents of the life estate, whether limited by way of trust or otherwise, except where there is a reverter or a cesser of the estate, dependent upon an attempted alienation, or seizure by creditors. This was laid down by Lord ELDON in *Brandon vs. Robinson, supra,* not as a novel or newly invented rule of property, but as the settled law of England ; and in the course of his opinion he referred to the old case of *Foley vs. Burnell,* 1 *Bro. C. C.,* 274, in regard to which he said: ''A great variety of clauses and means was adopted by Lord FOLEY with the view of depriving the creditors of his sons of any resort to their property ; but it was argued here, and, as I thought, admitted, that, if the property was given to the sons, it must remain subject to the incidents of

property; and it could not be preserved from the creditors, unless given to some one else." And in referring to this attempt on the part of Lord Foley, to exclude the creditors of his sons, by the nature of the trusts created under his will, Charles Butler, the distinguished real estate lawyer, and annotator of *Coke upon Littleton*, in note 132, to that work, at page 223b, (published in 1791,) says: "The illusory nature of estates and trusts of this description raises a powerful objection to them on the ground of policy; nor are they, perhaps, quite reconcilable to some of the fundamental principles of our law. Serious consequences, it is presumed, would ensue their coming into general, or even frequent, use."

There are many cases in which the rule has been stated and applied, but in none more clearly than in *Rochford vs. Hackman*, 9 *Hare*, 475, 480, by the Vice-Chancellor, Sir GEORGE TURNER. In that case he says, "First, property cannot be given for life any more than absolutely, without the power of alienation being incident to the gift; and that any mere attempt to restrict the power of alienation, whether applied to an absolute interest or to a life estate, is void, as being inconsistent with the interest given; and secondly, that although a life-interest may be expressed to be given, it may well be determined by an apt limitation over." He further declares, "That property cannot be given for life any more than absolutely, without the power of alienation being incident to the gift, appears to me to be well settled by the cases of *Brandon vs. Robinson*, 18 *Ves.*, 429, and *Graves vs. Dolphin*, 1 *Sim.*, 66. In both of those cases there were gifts for life, with provisions which were directed against alienation, but in neither of them was there any proviso for determining the life-interest, or any gift over in the event of alienation; and the Court, in each of those cases, held that

the life-interest continued; and these cases are not, so far as I am aware, contravened by any authority." In both the cases referred to, the directions to the trustees were to pay over to the legatees for life *exclusively, and to no other person*, the income; and terms of the most direct and explicit character were employed to exclude any claim on the part of creditors. But, notwithstanding, the legatees for life becoming bankrupt, the assignees were held to be entitled to the fund for the benefit of creditors. And so are many other cases that could be cited, if it were deemed necessary.

There is one well recognized exception to the general rule upon this subject, but that exception is *sui generis*, and is founded upon its own special reasons and policy. That exception is expressed in the usual clause against anticipation, in devises to and settlements upon married women, introduced in the time of Lord Chancellor THURLOW, for their special protection. This exception, and the reasons for it, have been well stated by the late Master of the Rolls, Sir George Jessel, in *Buckton vs. Hay*, 11 *Ch. Div.*, 645. In that case, the Master of the Rolls said: "In the first place, the law of this country says that all property shall be alienable; but there has been one exception to that general law, for restraint on anticipation or alienation was allowed in the case of a married woman. That was purely an equity doctrine, the invention of the Chancellors, and is, as I have said, an exception to the general law, which says that property shall not be inalienable. That exception was justified on the ground that it was the only way, or at least the best way, of giving property to a married woman. It was considered that to give it to her without such restraint would be, practically, to give it to her husband, and therefore, to prevent this, a condition was allowed to be imposed restraining her from anticipating her income, and thus fettering the free

7 v. 69.

alienation of her property.'' The incorporation of this
exception, and the reason for it, furnish strong proof,
not only of the existence of the general rule, but of the
very special circumstances and pressing reason under
which an exception could be allowed to that general
rule.

It is certainly not the fact, as has been sometimes
suggested, that the English cases, to which I have re-
ferred, introduced any novel doctrine into the law.
On the contrary, it has been very truthfully said, that
they simply make application of a principle older than
*Taltarum's Case.* The history and growth of the Eng-
lish law, its principles and remedies, as they have been
formulated from time to time, down to the most recent
time, prove this. Indeed, the great merit of the cele-
brated rule in *Shelley's Case* is, that it frustrates all
unreasonable restraints upon alienation, and renders
property liable for debts. As said by Professor Gray,
in his admirable little treatise on the *Restraints on the*
*Alienation of Property*, sec. 168, those cases are a part
of the struggle of the law against feudalism, and against
the attempt to give the enjoyment of wealth without
its responsibilities.

The course of legislation in this State aptly illus-
trates the policy, and shows the same tendency to
unfetter property, and to remove all restraints upon
alienation, and to subject all interest in property to
the debts and obligations of its owner. Just about
the close of the war of the Revolution, we find the
Act of 1782, ch. 23, for simplifying the method of dock-
ing estates tail; and four years thereafter, we have the
Act of 1786, ch. 45, directing the course of descents
and converting estates tail general into fee simple
estates, and thus rendering such estates liable to debts.
And then the Act of 1810, ch. 160, embodied in the
Code, Art. 83, secs. 1, 2, provides that *any and all*

*equitable estates and interest* in land, &c., shall be liable to execution for debt; and that any purchaser of such equitable estate or interest shall, upon payment of the purchase money, be entitled to an assignment or conveyance of such equitable interest, &c. There is no exception from the operation of this Act provided for, not even the estates of married women; though as to the latter such exception was unnecessary, for as the law stood at that time, executions did not issue against married women. This legislation plainly shows that it was the object and policy of the Legislature to render all estates liable for debt, except such as might be exempt by express statutory provision. To allow life estates, whether legal or equitable, or whether of the value of one hundred dollars, or of one million of dollars, (because if it can be of one amount it may be of the other,) to be withdrawn from the operation of the law, does seem to me, with due respect to the opinion of others, to be plainly in contravention of the policy, if not the very letter and spirit, of the statute. That the intention of the testator, *if not contrary to law*, is to govern in the disposition of his estate, is certainly a well settled principle. But that this is always subject to the condition that no principle or positive provision of law can be violated or disregarded by the testator, is equally well settled. He cannot create an estate and clog the power of alienation, or relieve it from liability for debts, any more than he can create a perpetuity by an executory devise after an indefinite failure of issue, or after any other future event that may not happen until after a life or lives in being, and twenty-one years afterwards. A man may direct the disposition of his estate after his death, but this must be done in subjection to the established rules of law.

Indeed, no system of law can be founded in wisdom or sound public policy, that allows restraints upon

alienation, or which allows property to be withdrawn from commerce, and rendered free from the honest obligation of its owner. Property is the basis of business confidence; and any law that destroys the basis of that confidence is detrimental to the public good. Any such law restrictive of alienation or liability for debts, operates to detract from the general utility and actual value of property. Moreover, it is an encouragement of idleness, and of a lack of enterprise; and worst of all, it fosters a class who become habitually reckless and indifferent to their honest obligations, from a sense that they are entrenched beyond the reach of the law. And if the principle of exclusion of all liability for debts can be effectually annexed to property, without any cesser of the estate, as means of protection against the improvidence of some, it must be allowed in respect to all; and with such principle established, we may well anticipate that, before many years, no inconsiderable portion of the property of the State, both real and personal, will be fettered with such restriction as that attempted to be imposed in this case.

It appears that there are a few State Courts, prominent among which are the Courts of Pennsylvania and Massachusetts, by which trusts, popularly known as *Spendthrift trusts,* whereby restrictions upon alienation and the liability for debts of the devisee or legatee for life, have been supported. But, until this case, no such trust has ever received the sanction of this Court; and the restrictive trust maintained in this case is purely one of judicial establishment. It is supposed, however, that the recent case of *Nichols vs. Eaton,* 91 *U. S.,* 716, has furnished authority for the rejection of the doctrine of the English Courts, and the adoption of this species of trusts in this State. But what was said in that case, in regard to such trusts, was entirely *obiter,* and was

in no manner required for the decision of the case as actually presented for decision. It furnishes, therefore, no authority for the decision of this Court. There, the mother of the bankrupt had bequeathed to him by will the income of a fund, coupled with a provision in the trust that on his bankruptcy or insolvency the legacy should *cease*, and go to his wife or children, if he had any, and if not, it should lapse into the general fund of the testatrix's estate and be subject to other dispositions. The assignee of the bankrupt sued to recover the interest bequeathed to the bankrupt, on the ground that this condition was void, as being against public policy. But the Supreme Court held, upon the case thus presented, that the condition, upon the happening of which the interest bequeathed to the son was to *cease*, was valid and effectual, and that no rights of creditors were violated thereby, nor any principle of policy contravened. This was the case actually presented, and with the decision of that case so presented, this Court has said it could make no question whatever. *Warner vs. Rice & Knell*, 66 *Md.*, 443. It was strictly in accordance with both the English and American authorities. It was the case thus presented, and nothing more, that was approved by the same learned Court in *Hyde vs. Wood*, 94 *U. S.*, 523. But after deciding the case, and showing that the bequest was in all respects valid, the learned Justice who delivered the opinion, proceeds to refer to and remark upon the decisions of certain State Courts, that hold a doctrine different from that held by the English Courts. And in conclusion he said : " We are not called upon in this connection to say how far we would feel bound, in a case originating in a State where the doctrine of the English Courts had been adopted so as to become a rule of property, if such a proposition could be predicated of a rule like this. Nor has the time which the

Smith & Son *vs.* Towers, Garnishee.

pressure of business in this Court authorizes us to devote to this case, permitted any further examination into the decisions of the State Courts. We have indicated our views in this matter rather to forestall the inference, that we recognize the doctrine relied on by appellants, and not much controverted by opposing counsel, than because we have felt it necessary to decide it, though the judgment of the Court may rest equally well on either of the propositions which we have discussed. We think the decree of the Court below may be satisfactorily affirmed on both of them.''

It is manifest, I think, from this passage from the opinion, that what was said by the learned Justice, in apparent approval of the American cases cited by him, was merely *obiter*, and was not really intended to be anything more. The case originated in the State of Rhode Island, and the appeal was from the Circuit Court for the district of that State. In that State the doctrine of the English Courts prevails to its full extent and without qualification, and is therefore a rule of property in that State. In *Tillinghast vs. Bradford*, 5 *R. I.*, 205, cited both in the argument and in the opinion in *Nichols vs. Eaton*, the Supreme Court of Rhode Island held, in reference to a devise in trust for life of an income, to be paid to the devisee, and not to his assigns or to others, that an assignee for the benefit of creditors was entitled to have the income paid over to him. The Court, in its opinion, said: '' This has been the settled doctrine of a Court of Chancery, at least since *Brandon vs. Robinson*, 18 *Ves.*, 429, and, in application to such a case as this, is so honest and just that we would not change it if we could. Certainly no man should have an estate to live on, but not an estate to pay his debts with. Certainly property available for the purposes of pleasure or profit *should be* also amenable to the demands of justice.''

Smith & Son *vs.* Towers, Garnishee.

But there are other reasons that preclude the inference that the Court, in *Nichols vs. Eaton*, intended, in what was said in regard to the American as distinguished from the English doctrine, to announce a definite judgment upon the subject. It is not to be supposed that the Court would, upon a question of such great general importance, undertake to examine authorities and formulate a definite conclusion, without making the least reference to its own opinion rendered but a few years before, in the case of *Nichols vs. Levy*, 5 *Wall.*, 433. In that case, the authorities, both English and American, were brought to the attention of the Court, and it was said, in the opinion, with the apparent concurrence of the entire Court, that "It is a settled rule of law that the beneficial interest of the *cestui que trust, whatever it may be,* is liable for the payment of his debts. It cannot be so fenced about by inhibitions and restrictions as to secure to it the inconsistent characteristics of right and enjoyment to the beneficiary, and immunity from his creditors. A condition precedent that the provision shall not vest until his debts are paid, and a condition subsequent that it shall be divested and forfeited by his insolvency, with a limitation over to another person, are valid, and the law will give them full effect. Beyond this, protection from the claims of creditors is not allowed to go." And in support of this proposition were cited by the Court, many of the English cases, and some of the American, and, in addition, 2 *Sto. Eq. Juris., sec.* 974*a*, where the doctrine is fully stated in accordance with the English authorities, as the settled law.

The length of this opinion renders it necessary that I should refrain from making special reference to the many American decisions upon this subject; but they have been fully collated and ably reviewed by Professor Gray, in his treatise on the *Restraints on Alienation of*

*Property;* and he has shown beyond question that the great preponderance of American authority is in support of the doctrine as maintained by the English Courts.

There is one case to which I will refer, and that is *Broadway National Bank vs. Adams,* 133 *Mass.,* 170, much relied on in this case. That case, as it appears to me, is somewhat remarkable, though I do not perceive that it has much application to the case before us. In the opinion of the Court it is conceded, that, by the rules of the common law, such restraint upon alienation or liability for debts as was there imposed, would not be valid. "But," says the Court, "the reasons of the rule do not apply in the case of a transfer of property in trust. By the creation of a trust like the one before us, the trust property passes to the trustee with all its incidents and attributes unimpaired. He takes the whole legal title to the property, with the power of alienation; the *cestui que trust* takes the whole legal title to the accrued income at the moment it is paid over to him. Neither the principal nor the income is at any time inalienable." Now, if the learned Court intended, by what was said by it, to lay it down as a general principle, that in any and all cases where the legal estate may be vested in a trustee, the power of alienation exists, irrespective of the special nature of the trust declared, and though alienation might be a breach of that trust, and that therefore the rule against restraints on alienation would not be violated, such proposition, I submit, would not stand the test of reason. The trustee holds the legal estate to serve the purposes of the trusts; and, except under special authority given, he cannot alienate the legal estate without committing a breach of trust, and the alienee would take the estate subject to the trust, and the conveyance be liable to be set aside. As I understand

it, it is because the beneficial and substantial owner-ship of property, though the legal estate may be in another, who is required to hold for the benefit of such substantial owner, is attempted to be secured to the use and enjoyment of the real beneficiary, exclusive of the ordinary incidents of property, that the rule against such restraint applies as well in equity as at the common law. Equitable as well as legal estates are property, and both species of estates are subject to the laws of property; and by those laws, both species of estates are alike subject to the law of alienation, and are liable to the debts of the real owner. If then there be reason and policy for the support of the rule against the restraint of alienation at the common law, as is conceded by the Court, in *National Bank vs. Adams,* I do not understand why the same reason and policy do not apply in the case of a transfer of property in trust. Nor is it a matter of much consolation to creditors to know that the *cestui que trust* takes the legal title to the accrued income of the estate from the moment it is paid over to him, and that he is thereby enabled to put it in his pocket in open defiance of the demands of justice; though it be true, he is, from that moment, at liberty to dispose of it as he may think proper.

2. But suppose the law to be as contended for by the appellant,—that it is competent to a testator or the founder of a trust, by the use of apt terms, to exclude the power of alienation by the *cestui que trust* for life, and all liability for his debts, the question then arises, has such restriction been effectually imposed in this case? As has been noticed, the only terms in the devise upon which reliance is placed for excluding the rights of the creditors, are those employed in the direction to the trustee, that, after certain deduc-tions for necessary purposes of the farm, the net rents and profits shall be paid into the hands of the son,

" and not into another, whether claiming by his author-
ity or otherwise," so long as the son shall live.    The
trustee is given no discretion, and the devise is to the
son absolutely for life.    According to all authority,
the exclusion of the right of alienation, and the lia-
bility for debts, can only be effected, if at all, by the
use of very clear and explicit terms.    Here, the di-
rection is only as to the mode of payment to the *cestui
que trust.*    I have found no well considered case, even
in the case of married women, in regard to whom such
restrictions may be imposed, where such terms as are
here used, have been held to have such operation.    In
*Brandon vs. Robinson, supra,* Lord ELDON said, " the old
way of expressing a trust for a married woman was, that
the trustee should pay into her proper hands, and upon
her own receipt *only;* yet this Court always said, she
might dispose of that interest, and her assignee would
take it; as if there was a contract, entitling the
assignee, this Court would compel her to give her own
receipt, if that was necessary to enable him to receive
it."    And certainly, if a *cestui que trust* can assign the
interest, that interest can be made liable for his debts.
The same principle is clearly stated by Judge STORY,
in 2 *vol. Eq. Juris., secs.* 1382a and 1383.    And in the
case of *Acton vs. White,* 1 *Sim. & St.,* 429, it was held
by Sir JOHN LEACH, V. C., that a devise to trustees for
the separate use, with a direction to pay the rents,
income, or interest, from *time to time* into the proper
hands of the *cestui que trust* for life, (the wife of the
devisor,) was not sufficient to impose the restriction,
though the words, "*and not otherwise,* and that the
receipt of the *cestui que trust alone* for what shall be paid
*into her proper hands* shall be sufficient discharge,"
were added.    The principle is settled that such restric-
tion will not be implied from any ambiguous expres-
sions, but must be declared in express terms, or be

deducible from words that admit of no doubt whatever. The words here are not free of ambiguity.

I am of opinion therefore, upon both grounds, that the fund was attachable for the debts of the *cestui que trust;* and under the facts agreed on, I can perceive no difficulty in rendering judgment of condemnation, according to the practice recognized in *Early vs. Dorsett, Harris & Co.,* 45 *Md.,* 462. The judgment below, according to my view, ought to be reversed.

(Filed 12th June, 1888.)