SAMUEL T. JONES ET AL. *v.* KATHERINE ARCHER ENDSLOW ET AL.

[No. 823, September Term, 1973.]

*Decided November 27, 1974.*

The cause was argued before MOYLAN, POWERS and GILBERT, JJ.

*Richard C. Murray* for appellants.

*T. Carroll Brown* and *Franklin S. Tyng* for appellees.

POWERS, J., delivered the opinion of the Court.

The question in this case is whether the will of Charles S. Archer, Sr. created a trust, and, if so, did the trustee take a fee simple title to real estate, with power to sell.

Mr. Archer died on 10 July 1963. He and his wife, who predeceased him by six weeks, owned a farm of some 122

acres in Harford County, and a relatively small amount of personal property. They had four children, Daniel Trainor Archer, James Howard Archer, Katherine Archer Endslow, and Charles S. Archer, Jr. All were adults, and all had children.

Over a period of a year or more before September, 1961, there had been family discussions regarding the wishes of the parents for the disposition of their property. All of the children except Trainor, the oldest, took part in these discussions. The parents expressed their concern for Trainor, who was in poor health and had limited earning ability, an invalid wife, and a handicapped son. In addition, there were one or more judgments against Trainor, and he owed other debts. The parents contemplated giving all of their property to Trainor outright, but Charles, who was a member of the bar, employed by a bonding company in Baltimore, expressed his disapproval, and said that if the other three children were to be disinherited, he wanted the parents to get an outside lawyer to prepare their wills.

The family discussions continued. The primary wish of the parents was to be assured that Trainor would always have a home and a living. As part of that assurance, they felt that it was necessary to protect Trainor against his own shortcomings. Charles suggested a "spendthrift trust", and advised the family that, to avoid embarrassment to Trainor, such a trust could be created without using the specific words, and that it was not necessary to designate a trustee in the will. This suggestion was approved by the parents, and by Howard and Katherine. Charles was asked to prepare the wills. He did so. They were executed on 6 September 1961, with Howard and Katherine as witnesses. Charles was also present.

Upon the death of Mrs. Archer, Mr. Archer, Sr. became the sole owner of their property. His will, admitted to probate in the Orphans' Court for Harford County, provided, after a clause leaving everything to his wife:

"If my devoted wife, Viola Mary Archer, should pre-decease me, then I give, bequeath, devise and

convey all my real, personal and mixed property, wheresoever situated, as follows:

First, to my oldest son, Daniel Trainor Archer, if he is living at my demise, for life, the income therefrom to be paid into his hands and not into the hands of another.

Second, upon the death of my oldest son, Daniel Trainor Archer, I give all my real, personal and mixed property, wheresoever situated, as follows:

1. One-fourth (1/4) of my entire estate to my grandson, William T. Archer, son of Daniel Trainor Archer, for his full and sole enjoyment.

2. One-fourth (1/4) of my entire estate to my son, James Howard Archer, for his full and sole enjoyment, if living, otherwise his one-fourth (1/4) share shall be divided among his children, share and share alike."

There followed paragraphs identical with No. 2, leaving one fourth each to Katherine and to Charles, and an additional paragraph appointing Charles executor.

With the closing of the administration of the personal estate in November 1964, a petition was filed in the Circuit Court for Harford County signed by Charles, individually and as executor, and by Katherine, Trainor, Howard, and by Trainor's son William, described as constituting all of the heirs and persons named in the will of the decedent, and stating:

"That under the Last Will and Testament of Charles S. Archer, Sr., a spendthrift trust consisting of all of the real, personal and mixed property in the estate was created for the benefit of Daniel Trainor Archer, one of the within named petitioners. A copy of the probated Will is filed herewith."

The petition then recited that the will failed to provide for the appointment of a trustee to administer the trust and

prayed that the court pass an order "appointing a trustee or trustees to administer said Spendthrift Trust". The court appointed C. Stanley Blair, a member of the bar, who had acted as attorney for the estate.

By common acquiescence, the trustee permitted Trainor, who lived on the farm, to collect any income it produced, and retain what was left after paying taxes and insurance premiums, without accounting for these items through the trustee. The trustee invested the money from the personal estate, and paid the income to Trainor.

In 1969 Mr. Blair filed a petition stating that he desired to resign as trustee and asking that he be released and discharged. At the same time there was filed a petition by all of the same individuals who originally petitioned for the appointment of a trustee, asking the court to appoint Charles S. Archer, Jr. as substitute trustee in the place of Mr. Blair. The court entered an order appointing Charles S. Archer, Jr. "to act as trustee of the Spendthrift Trust provided for in the Last Will and Testament of Charles S. Archer, Sr.". Charles has continued to act to the present time, following the same procedure initiated by his predecessor.

The case before us arose when, on 6 March 1972, Charles, as trustee, entered into a contract with Samuel T. Jones and Sarah S. Jones to sell the farm for the sum of $98,000. On 28 March 1972, Katherine, joining her son and two daughters as plaintiffs, filed a bill of complaint against Charles as trustee and included as defendants, Trainor, Trainor's son William, Howard, and Mr. and Mrs. Jones. A later amendment added Charles in his individual capacity.

The bill of complaint recited the history of the property, the estate, and the trust. It alleged that Daniel Trainor Archer holds a legal life estate in said property and that there is no need for a trustee. It alleged that Charles, as trustee, entered into a contract with Mr. and Mrs. Jones, and said that Charles exceeded his authority and violated his duties as trustee in selling the farm and in selling it for a sum that was grossly inadequate and on terms not advantageous to those having an interest in it. The

complaint also alleged that because of his activities and poor judgment Charles should be removed as trustee. The plaintiffs prayed that the sale be enjoined, and that they be awarded monetary damages against Charles.

The court issued an interlocutory injunction against consummation of the contract of sale.

Testimony was heard before the chancellor on 19 April 1972, 20 December 1972, 23 February 1973, and 22 June 1973. On 29 August 1973 the chancellor filed a memorandum opinion, which was implemented by a decree filed on 17 September 1973. The decree adjudged that by his will the testator simply created a legal life estate in all of his residuary estate and property for the benefit of Trainor; permanently enjoined consummation of the contract of sale; found that Charles had properly performed his duties as trustee; and denied the claim of Katherine and her children for damages. Appeals from that decree were filed by Charles S. Archer, Jr. and by Mr. and Mrs. Jones.

The evidence showed that around the middle of 1971, members of the family began to discuss selling the farm. Trainor wanted it to be sold because he was not able to make a go of it and was sustaining losses. He preferred that it be sold and the proceeds invested in some other way. Katherine testified at one of the hearings that she did not not want to see it sold but, if it were to be sold she would like to see it remain in the family. In a letter, addressed apparently to all three brothers, dated 17 August 1971, Katherine thanked them for their offer of terms for an agreement to sell the property to her son. She proposed, in considerable detail, that the son would be willing to buy the farm for $85,000, with 5% or $4,250 in deposits, and with an additional sum of $12,750 in cash at settlement, in approximately six months, leaving $68,000 to be paid over a period of five years or ten years, bearing interest at the rate of 6%. An attorney retained by Charles as trustee responded to Katherine, advising her of the terms of an offer from another source at the same price but with slightly higher payments. The letter advised that if she or her son wished to purchase the property on exactly the same terms, they could do so. On 30

August 1971, Katherine wrote to Charles expressing her thought that there was no need for urgency. She mentioned that Trainor seemed obsessed with the idea of selling and realized that Charles had been under great pressure to do so. She pointed out that the intent of the will, as repeatedly told to her by her mother, was that Trainor would have a home and a roof over his head until his death. She went on to say that since the interest resulting from the sale should amply provide such security, she certainly would not stand in the way of selling. She said further that she had learned of an appraisal of the property, and felt that it was worth about $90,000. She said:

> "Charles, you are the trustee by our approval, but you have the obligation to get the highest market price in this sale."

Katherine suggested that her son be given an option for six months to purchase the farm for $90,000 with 10% deposit and settlement 90 days thereafter, with a total of 30% down at settlement. She added, "No one can ever rightfully criticize if you sell at appraisal price."

Some correspondence was exchanged between counsel for Charles and counsel for Katherine and, after a brief withdrawal of an offer to sell, another offer was made to Katherine. She responded in a letter directly to Charles, dated 12 October 1971, in which she stated: "I am interested in seeing the property remain in the family and being improved creditably to the memory of our parents. So long as there is a member of the family interested I shall not approve the sale of the property to another." She then made a "final counter offer", based on additional appraisal data which she referred to, and offered $87,000, with settlement to be on 15 May 1972.

By letter of 1 November 1971, counsel for Charles as trustee wrote to Katherine advising her that the trustee intended to sell the property forthwith; asserting that the trustee had authority to do so without the approval of any beneficiary or of the court; and suggesting to Katherine that she take such steps as she deemed requisite to enjoin the

sale. Counsel's letter went on to say that the offer of $87,000 as the sale price was acceptable but that the settlement terms and other conditions were not. One of the conditions previously stated by Katherine which counsel rejected was that her son's wife should not be involved in the transaction.

The same appraiser whose preliminary data had indicated to Katherine an approximate value of $90,000, submitted his written appraisal dated 23 December 1971 in which he gave the value of the farm as $84,300.

In his memorandum opinion the chancellor, looking at the language of the will, observed that it appears to provide for Daniel Trainor Archer a life estate in all of the real, mixed and personal property of the testator. He went on to say that he would have little difficulty in holding that there was no trust, were it not for the language, "income to be paid into his hands and not into the hands of another". He commented that even assuming that the intention of the testator was to create a spendthrift trust, there is no indication that the subject matter of the trust was to be other than the life estate itself or the income interest in the land.

In spite of the difficulty, however, the chancellor concluded that the will does not provide for a trust, spendthrift or otherwise. The decree which followed the filing of this memorandum opinion did not leave open any possibility of a spendthrift trust. It is, of course, the decree and not the opinion of a court which governs. *Hudson Bldg. Supply Co. v. Stulman,* 258 Md. 304, 265 A. 2d 925 (1970).

The chancellor commented further on the evidence showing that Katherine appeared to acquiesce in the power of sale over the property up until the last moment and then withheld her consent. He said, "[T]he Court does not believe that the conduct of the parties can in any way alter or increase the powers vested in the Trustee by virtue of the instrument." We fully agree. Short of estoppel, which was not shown, or other binding action, a party is free to change his legal position.

All of the testimony in the case shows that it was the desire of the testator to leave his property in such a way as to be sure that Trainor would, as long as he lives, receive the

entire benefit of it, including a place to live and the means of producing an income. It was just as much a part of that intention that what he wanted to create for Trainor would be protected against any claim by a creditor and against Trainor's own folly or ineptitude.

That accomplished, the final desire of the testator was to be sure that upon Trainor's death, each of his children would receive an equal share of the family property, with Trainor's son William standing in his stead.

All of the members of the family agree that this was the intention of their parents. They agree, also, that Charles, as the draftsman of the will, purposely avoided the words "spendthrift" and "trust", and the designation of a trustee, all of which would have expressed that intention more clearly, but that it was his opinion, and his advice to the testator, that the words he used were sufficient to accomplish that intention. The intention of the testator in this case may be ascertained beyond doubt from the will, read in the light of the surrounding circumstances. To construe the will as creating simply a conventional life estate is not to construe, but to reject and nullify the testator's words, "the income therefrom to be paid into his hands and not into the hands of another". Those words closely parallel words used in the will construed in *Smith v. Towers*, 69 Md. 77, 14 A. 497 (1888), the first case in Maryland involving what has come to be known as a spendthrift trust.

Because we conclude that the only way to accomplish the testator's purpose is through a trust, the device by which equitable title may be separated from legal title, and that the trust must continue for the duration of Trainor's life, subject to the restraints on alienation which are known, for convenience, as a spendthrift trust, we hold that the will of Mr. Archer, Sr. created such a trust.

In *Smith v. Towers, supra,* the Court of Appeals said, at 83-84:

"The testator devised certain real estate to his friend John R. Fountain in trust to collect the rents

and profits, and to pay the same to his son Robert, 'into his own hands, and not into another, whether claiming by his authority or otherwise,' and upon his death to convey said real estate to such children of his son Robert as may be living at the time of his death.

"Upon the construction of this clause of the testator's will two questions arise: First, did the testator mean to give the income of the property to his son to the exclusion of his creditors, and secondly, if so are the terms and provisions of the will effectual to carry out this intention. There can be no difficulty whatever as to the first point. He not only gives the legal estate to the trustee, but he directs in express terms that he shall pay the income into the hands of his son and not into the hands of any other person, whether claiming by his authority, or in any other capacity. Here then, is an express provision, that the income shall be paid to his son, and an express prohibition against paying it to any other person. If the income in the hands of the trustee is liable to the claims of creditors, the trustee it is plain could not carry out the trust. So construing this will as we do, and it is not we think susceptible of any other construction, the testator meant beyond all question that the income should be paid into the hands of his son, to the exclusion of all other persons, whether claiming as alienees or as creditors."

Referring to language in a will before it in *Johnson v. Stringer*, 158 Md. 315, 148 A. 447 (1930), the Court of Appeals said, at 322-23:

"This language is the identical language held by this court to have created a spendthrift trust in the case of *Smith v. Towers*, 69 Md. 77. This case was the first expression of this court on the question of a spendthrift trust, and is a leading case on that subject. This decision was in 1888, since which time

it has been settled that a spendthrift trust may be validly created in Maryland if appropriate language be used; and in the numerous subsequent cases in this court, considering the subject of a spendthrift trust, the questions have not been as to the power of the testator to create such a trust, but as to his intention to do so, and the sufficiency of the language used to give effect to such intention."

In Griswold, *Spendthrift Trusts*, § 262 (2d ed. 1947), the author says:

"The phrase 'spendthrift trust' is recognized as simply a convenient term used to indicate a trust in which the interest of the beneficiary is subject to restraints on alienation, and it has no significance in itself. It is not necessary that the beneficiary be a spendthrift.

"Conversely, it is not enough for the creation of a spendthrift trust to show that the beneficiary is in fact a spendthrift."

Section 264 says:

"It is established in the cases, and quite rightly, that where spendthrift trusts are valid no particular form of words is required to create such a trust. * * * The intention to establish a spendthrift trust ought clearly to appear in the instrument creating the trust, for, as more than one court has observed, any other rule 'would be in effect saying that all life estates of like character, given in trust, are incapable of being alienated.' There should be 'specific language declaring the trust a spendthrift trust or language from which such an interest might reasonably be inferred.' A mere trusteeship is not enough to make a spendthrift trust."

In II Scott, *Law of Trusts* (3d ed. 1967), the author says in § 151:

"Trusts in which the interest of a beneficiary

cannot be assigned by him or reached by his creditors have come to be known as 'spendthrift trusts.' The term is not altogether felicitous, since it is quite immaterial whether or not the beneficiary is in fact a spendthrift. The term does, however, connote the general idea that the purpose of the settlor in creating such a trust is to protect the beneficiary against his own folly or inefficiency or misfortune. It is useful, at any rate, as a short phrase indicating that the interest of the beneficiary is subject to a restraint on alienation, whether the restraint is imposed by the terms of the trust or by statute."

and in § 152, Scott says:

"Where the owner of property creates a trust under which the income is payable to a beneficiary for life and it is provided that the interest of the beneficiary shall not be transferable by him and that his creditors shall not be permitted to reach it, the question arises whether these direct restraints on alienation are valid. Where a *legal* life estate is created, it is generally held that a direct restraint on alienation, voluntary or involuntary, is invalid. The owner of the life estate, in spite of such a provision, can transfer his interest and his creditors can reach it. The question is whether similar provisions as to the right of a beneficiary to the income under a trust are valid."

To have a spendthrift trust, there must, of course, be a trust. Without the words of restraint on Trainor's life estate we would be unable to find the intent to create a trust. But those words, in light of surrounding circumstances existing at the time of execution of the will, make a trust imperative, and must be given effect.

In *Waesche v. Rizzuto*, 224 Md. 573, 168 A. 2d 871 (1961), the Court of Appeals, after referring to the elements necessary to create an express trust, said, at 583:

"Whether or not a trust is created by the terms of

a will is a question of intention, technical words not being required. It is enough that the intention to create a trust is apparent. Jarman on Wills (5th ed.), §§ 355, 356; *Coudon v. Updegraf*, 117 Md. 71, 78.

"In that case this Court stated that, in the interpretation of wills 'the cardinal canon around which all others center is this, that the intention of the testator when ascertained from the whole instrument, or from the instrument as read in light of surrounding circumstances existing at the date of its execution, must be given effect if that intention does not antagonize or conflict with some rule of law or property.' *Henderson v. Henderson*, 64 Md. 185; *Darden v. Bright*, 173 Md. 563; *Robinson v. Mercantile Trust Co.*, 180 Md. 336; *Jones v. Holloway*, 183 Md. 40; *Robb v. Berryman*, 215 Md. 161; 95 C.J.S., *Wills*, §§ 590, 592."

The rule has also been expressed:

"Whether a trust has been perfectly created is largely a question of fact in each case, and the court, in determining the fact, will give effect to the situation and relation of the parties, the nature and situation of the property, and the purposes or objects which the settlor had in view." *Sieling v. Sieling*, 151 Md. 536, 551, 135 A. 376 (1926), quoting from *Mills v. Hayden*, 128 Wash. 67.

The Court of Appeals went on to say in *Sieling v. Sieling, supra*, at 551:

"No technical words or language are required for the creation of a trust, if the language and acts of the parties clearly indicate that such was their intention. Neither does the writing have to be in any particular form."

In *Brandt, Inc. v. Y.W.C.A.*, 169 Md. 607, 182 A. 452 (1936), a testator left his residuary estate to the Y.W.C.A., a corporation, in trust, to use the income for the use and

benefit of the body corporate in such manner as the officers and directors shall deem proper. The Y.W.C.A. contracted to sell a parcel of real estate, one of the investments of the estate. The purchaser was unwilling to settle because of uncertainties in the title. In a bill for specific performance the Y.W.C.A. contended that it had absolute title to the land, that there was no separation of the legal estate from the beneficial enjoyment, and no trust existed.

The Court of Appeals agreed, saying, at 611:

> "The rule with respect to such trusts, so-called, in this state, as stated by Mr. Miller, *Construction of Wills*, p. 458, is that, 'the same person cannot be both trustee and *cestui que trust;* in a trust there must be a separation of the legal estate from the beneficial enjoyment, and a trust cannot exist when the same person possesses both; if the entire legal and equitable interests happen to meet in the same person, the equitable is ordinarily merged in the legal.' "

In *Sands v. Church, etc.*, 181 Md. 536, 30 A. 2d 771 (1943), two members had made a gift of bonds to their church, and expressed the wish that the income would be used for the payment of the ground rent on the church.property. When the church merged with another, and sold its original property, the heirs of the donors claimed that the bonds were held in trust for a specified purpose, and when that purpose could no longer be served, the bonds reverted to them. The Court of Appeals held that there was no trust. It said, at 541:

> "It was urged by counsel that the word 'wish' sometimes has the effect of creating a trust. It is undoubtedly true that no technical words are required for the creation of a trust, provided that the language and the circumstances clearly show that such was the intention. Whether or not a trust has in fact been created in a particular case by the use of precatory words is, in the final analysis, a question of intention. One of the fundamental rules

of construction is that the intention of the donor must govern if consistent with the rules of law, and this intention must be gathered from the entire instrument. It is recognized that where a writing imports the granting of absolute ownership to the donee, and there are additional words expressing the donor's wish as to the use of the property, no precatory trust has been created. *Nunn v. O'Brien,* 83 Md. 198, 34 A. 244; *Pratt v. Trustees of Sheppard & Enoch Pratt Hospital,* 88 Md. 610, 622, 42 A. 51, 54; *Bennett v. Baltimore Humane Impartial Society,* 91 Md. 10, 19, 45 A. 888, 889; *Sieling v. Sieling,* 151 Md. 536, 551, 135 A. 376, 382. It is also well established that a person cannot be both the trustees and the *cestui que trust.* It is obvious that in order to create a trust the legal estate must be separated from the beneficial enjoyment, and therefore a trust cannot exist where the same person possesses both."

Whenever the purpose of the testator or settlor to create a restricted beneficial enjoyment of an estate is found in the words used in the trust instrument, Maryland has consistently held the accomplishment of that purpose to be paramount. *Kirkland v. Mer.-Safe Trust Co.,* 218 Md. 17, 145 A. 2d 230 (1958).

We have shown that the clearly expressed purpose of the testator with respect to his son Trainor compelled the creation of a trust to separate, during Trainor's life, the equitable estate from the legal estate, and required that there be a trustee to hold the legal estate. The will in the case before us did not name a trustee. Charles had advised that it was not necessary, and that the court would appoint a trustee. Charles was right. Equity will not permit a trust to fail because a trustee is not specifically named. *Bishop v. Safe Dep. & Trust Co.,* 170 Md. 615, 620, 185 A. 335 (1936). The appointments of the original trustee, and later a successor trustee were proper.

This brings us to the question, "what legal title did the trustee take?". The answer is critical to the real dispute in

this case. We hold that the trustee did not take a legal fee simple title in the real estate, but took a legal estate *pur autre vie*, for the duration of Trainor's life, and no more. We assume, though we need not and do not decide, that the trustee holds legal title to the personalty, I Scott, *Law of Trusts* § 88.1 (3d ed. 1967), and that the title to the remainder in the real estate reposes, not divided between equitable and legal interests, in the remaindermen in whom it vested under the will.

Restatement (Second) of Trusts § 88 (1959), says:

> "(1) Unless a different intention is manifested, the trustee of an interest in land takes such an estate, and only such an estate, as is necessary to enable him to perform the trust by the exercise of such powers as are incident to ownership of the estate."

Illustrating the extent of the estate taken by a trustee in land, the Restatement gives, among others, these illustrations:

> "3. A, the owner of Blackacre, transfers Blackacre to B in trust to pay the income to C during C's lifetime and with power to sell Blackacre and invest the proceeds and pay the income to C for life. B takes an estate in fee simple in trust."

> "6. A, The owner of Blackacre, devises Blackacre to B and his heirs in trust to pay the income to C during C's lifetime. In the absence of evidence of a different intention of the testator, B takes an estate for the life of C in trust."

I Scott, *Law of Trusts* § 88 (3d ed. 1967) agrees, thus stating the rule:

> "It is frequently stated in the books that where land is conveyed in trust, inter vivos or by will, the trustee takes such an estate and only such an estate as is necessary to enable him to perform the trust."

In 54 Am. Jur. *Trusts* § 98 (1945), we find:

> "From the viewpoint of the common law, as modified by the Statute of Uses, the trustee has full legal title for the term for which the property is conveyed to him, in so far as his title is not executed under the Statute of Uses; but from the viewpoint of equity jurisprudence and modern law, the legal estate of a trustee is measured by the purposes of the trust and their performance, and not by the presence or absence of words of inheritance. * * *
>
> "A trustee has the legal title in fee, where a fee is necessary to the execution of the trust, or a life estate, where that is necessary * * *."

The same principle was applied in *Brillhart v. Mish,* 99 Md. 447, 58 A. 28 (1904); *Numsen v. Lyon,* 87 Md. 31, 39 A. 533 (1898); and *Long v. Long,* 62 Md. 33 (1884), and well summarized by Mr. Miller in his work on *Construction of Wills* § 203 (1927), where he says:

> "Whether an estate given to trustees in any particular case is a fee simple estate, or any other estate, does not depend upon whether the testator has used words of limitation or expressions adequate to carry an estate of inheritance, but whether the exigencies of the trust as they appear on the face of the will, without reference to events subsequent to the testator's death, demand the fee simple, or can be satisfied by any and what less estate. The trustees take exactly that quantity of interest which the purposes of the trust require. The extent of the legal interest of a trustee in an estate given to him in trust is measured not by words of inheritance or equivalent terms, but by the objects and extent of the trust upon which the estate is given. Whenever a trust is created, a legal estate sufficient for the purpose of the trust shall if possible be implied in the trustee, whatever may be the limitations in the instrument, whether to him

and his heirs or not. And on the other hand although a legal estate may be limited to a trustee to the fullest extent, as to him and his heirs, yet it shall not be carried farther than the complete execution of the trust necessarily requires."

We hold that the testator did create a trust of all of his property, real, personal and mixed, for the life of his son Trainor, subject to the restrictions upon voluntary or involuntary alienation and upon anticipation by the beneficiary, which are associated with what is commonly known as a spendthrift trust. The equitable title thus restricted is in Trainor for his life. With respect to the real property, the trustee holds legal title to a life estate only.

It follows that the trustee has no power to sell the fee simple interest in the real property because he does not have title to the fee simple interest. His attempt to do so was a nullity, the knowledge of which is equally chargeable to the appellants Mr. and Mrs. Jones.

It appears from the record that Charles, as trustee, was advised by his counsel that he had authority to sell the real property without the approval of any beneficiary or of the court, and there is no intimation in the record that Charles acted in any way other than in the conscientious discharge of what he understood to be his duty.

All of the members of the family did give consideration over a period of several months to a sale of the property, so that the proceeds could be reinvested in another form, the yield of which might be more advantageous to the life beneficiary. Had all parties agreed to a sale and participated in it, we know of no reason why it could not have been accomplished. The impression that the trustee had authority to sell without approval of any beneficiary or of the court probably arose from a misconstruction of Maryland Rule V77. The expansion of fiduciary powers which Rule V77 accomplished did not confer upon a trustee a power to sell something he does not have.

The decree appealed from was in error in holding that the will created a legal life estate in Daniel Trainor Archer. We hold that the will created a trust for the life of Trainor for

his benefit, subject to the spendthrift restriction. We agree that Charles, as trustee, had no power to sell a fee simple interest in the real estate and that his attempt to do so was a nullity. We agree, also, that Charles, as trustee, has properly performed his duties, and that there is no basis for removing him or assessing damages against him.

Appellees made two motions to dismiss this appeal. Both motions will be denied.

> *Motions to dismiss denied.*
>
> *Decree modified in accordance with this opinion and, as modified, affirmed.*
>
> *Costs in this Court and below to be paid by the trustee from the corpus of the personal estate in his hands.*