LOYOLA  FEDERAL  SAVINGS  AND
LOAN  ASSOCIATION  ET AL.  *v.*
EDWIN  GALANES  ET UX.

[No. 93, September Term, 1976.]

*Decided  November 8, 1976.*

The  cause  was  argued  before  THOMPSON,  POWERS  and
MELVIN, JJ.

*Gary  A.  Goldstein,*  with  whom  were  *Schimmel  &
Tatelbaum, P.A.,* on the brief, for appellants.

*Leonard A. Orman* for appellees.

THOMPSON, J., delivered the opinion of the Court.

Edwin Galanes and Rita Yvette Galanes, his wife, the appellees, obtained a judgment in the Superior Court of Baltimore City, after a jury trial, in the amount of $19,000.00 against Loyola Federal Savings and Loan Association, (Loyola), James H. Jones and Calvin T. Weaver, the appellants. It is contended on appeal: (1) that the action could be maintained only in equity and (2) the evidence was insufficient to support the verdict.

Mr. & Mrs. Galanes, residents of Virginia, began to look for a home in Maryland when Mr. Galanes' work was transferred to Maryland. Eventually, they contacted King Brook Builders and entered into a contract with them to build their home in Anne Arundel County. The builder referred them to Loyola for the purpose of obtaining a construction loan and permanent loan on their future home. Mr. & Mrs. Galanes advanced the builder from their own funds and credits the sum of $4,000.00 and obtained a loan from Loyola in the amount of $16,000.00. They executed a note and a deed of trust to secure the loan. In addition, Loyola required the Galaneses to enter into a trust agreement with James Jones and Calvin T. Weaver as the named trustees. The agreement recited that it was to be for the benefit of the Galaneses and Loyola; that the $16,000.00 was to be advanced by the trustees in five installments under a schedule of payments when certain portions of the house were completed in accordance with the plans and specifications; and it provided that the improvements must be made in strict compliance with all of the plans and specifications unless changes were authorized in writing by Loyola, the trustees and the owners. The trustees were to be relieved from any liability as to third persons or as to faulty quality of materials and workmanship.

The trust agreement recited that each and every advance would be made only after inspection by Robert O. Murray or his successor. The record indicates that the trustees attended the loan settlement and executed the agreement together with the Galaneses. Loyola did not sign the agreement. The record indicates that the trustees were

full-time employees of Loyola and their participation after the execution of the agreement was nil. We note that the five checks covering the installments were drawn on the account of Loyola at the First National Bank, Baltimore, Maryland, and signed by a Mr. Israel, "authorized signature." The photocopies of the checks in the record are such that we cannot further identify Mr. Israel. These checks total $15,000.00, the extra $1,000.00 being withheld pending completion by the builder of some outside concrete work. The $1,000.00 was later applied to the debt at the request of the Galaneses. No check was introduced into evidence showing any payment to the trustees although Leo J. Will, Vice-President of Loyola and a manager of the Catonsville office, did testify in response to leading questions that the $16,000.00 was placed in a trust fund. None of the inspections was made by Robert O. Murray; there is nothing in the record to show that the trustees chose any successor or successors to him as they had the right to do under the agreement. The record shows that the first, second and fifth inspections were made by Mr. Will, to whom the Galaneses had applied for the loan and with whom they had substantially all of their dealings thereafter. The third and fourth inspections were made by one R. E. Creider, also an employee of Loyola.

All of the exhibits were introduced by stipulation, and it was also stipulated that the checks were made payable to the Galaneses, had to be signed by them, and that Loyola had financed five of nine houses built by King Brook Builders in the particular subdivision. It was stipulated the damages were $19,000.00.

Only two witnesses testified, Rita Yvette Galanes, one of the appellants, and Leo J. Will, Vice-President of Loyola, but it was stipulated that Mr. Galanes' testimony would be the same as that of his wife. Mrs. Galanes testified that the checks were not given to her but that Loyola delivered them to the builder who brought them to the Galaneses for signature. At the time of the third draw Mrs. Galanes contacted Mr. Will and told him that all of the work that was supposed to have been done before the check was issued

562

had not been completed, and they did not wish to sign the check when "nothing on the specifications of the contract was being followed." Further, it was obvious to the naked eye that the work was not being done in a professional manner, and that she was on the construction site every day and never saw any person make an inspection. To an inquiry as to what response she received from the bank over her complaint, she replied, "Mr. Will told me that the bank was not responsible for the type of work that was being done. He told me I had to sign the check or the man would never build the house. He also told me that if we didn't sign the check we would forfeit the house and lose — the bank would foreclose, so we would have lost everything we had." She went on to add that she called Mr. Will an average of twice a week thereafter complaining that advances were being made prior to the time they were supposed to be under their agreement and that after she couldn't get satisfaction from Mr. Will, she ". . . called Mr. Israel's office. Mr. Israel is the President of all Loyola, I would imagine, and I talked to a secretary, office manager, business manager, I don't know what he was and I told what was going on in this particular case and they said they would check into it." She stated that she never heard anything further except that they were checking into it. She further stated that, "When we refused to sign the payment, Mr. Will would say, well, how do you expect them to build your house when you don't give them the money or he also said, you have to pay him the amount of the money so he can put the roof up on the house across the street and then they get a check from that and then he can continue working on your house." And further:

> "Q. Did he ever do anything or come out to see about the fact that the house was not being — or that the schedule of construction was not being met?
>
> A. Not to my knowledge. No one ever did and that one particular incident, they had poured the basement floor and tiled it and my husband and I went over there to see how the house was coming along that evening and the whole floor had sunk

three feet, the whole floor. I called Mr. Will about that because, at that particular time there was another check being issued and I said I don't think we should give this check out. I said, what guarantee do we have that this floor will be fixed. He said, give it to them, sign the check, sign the money over. How do you expect your house to get built.

Q. What, if anything, did Mr. Will say to you?

A. He told me if I didn't sign the check the bank would foreclose on it and I would lose everything.

* * *

A. The fifth check, when the builder walked in with the fifth check and my husband called Mr. Will at home and said, Mr. Will, we don't want to sign this check.

Q. Did he say the same thing?

A. He said sign it, certainly. How do you expect your house to get built.

Q. Did he also say he would foreclose if you didn't sign it?

A. Yes, he did.

Q. And, did you believe him?

A. Yes, I did. I really did. It was a terrible experience all the way along."

She testified that the builder had arranged for them to live in an apartment while the house was being completed but that the gas and electric were turned off and the landlady informed them they would have to get out; whereupon on December 22, they moved into their home which was not completed and after all the money had been paid to the builder. There was no heat in the house at the time they moved in. She testified that they had filed suit against the builder and recovered a judgment which was noncollectable because he had gone out of business soon after they moved into their home. She testified that she never saw Mr. Jones or Mr. Weaver after the day of

settlement. She thinks she may have called their office once about her complaints but was not certain.

Mr. Will testified that at the time of the transaction with the Galaneses he was Vice-President of Loyola in charge of the Catonsville office but that he had since retired. He outlined the general procedures on construction loans that payments were made only after proper inspection. Once the bank receives notice that construction had reached a certain stage, "we assign an inspector to go out and inspect the property, to see that the construction had advanced and is completed to that particular stage and, if that is done, then a check ... is delivered to the branch office and, in turn, delivered either directly to the borrower or, if the borrower is not available, then it is given to the builder to take to the borrower." Under the agreement it was not their (Loyola's) obligation to inspect the quality of the work but only that various stages were completed. He stated that the Galaneses complained only about a number of small things that needed to be corrected and he had no control over foreclosure and never said anything about that. On cross-examination he testified that the Galaneses were referred to Loyola by Henderson Real Estate Company with whom his office had made numerous loans over a period of years. He testified that King Brook Builders was a new builder as far as he was concerned but that he later found out that Mr. Henderson had some connection with it, although he did not know the exact extent of it. He testified that he had known Mr. Henderson personally for over 20 years. On cross-examination he admitted that it was their obligation not to make a payment until each stage of the schedule of payments was met. He pointed out that the agreement provided that there was no responsibility for the quality of the work and that he did not "recall" saying that the mortgage would be foreclosed if Mr. & Mrs. Galanes did not sign the checks, although admitting that he had seen Mr. & Mrs. Galanes in person and talked with them some on the telephone before all the money had been distributed.

"Q. Okay. Let me finish this question, Mr. Will. You have no recollection, isn't it true, because of

the passage of time, whether or not Mrs. Galanes called you and told you that King Brook was not building the house in accordance with the plans and specifications and had not completed various types of work which were supposed to be completed?

A. I recall that she called me, telephoned me and complained about some of the work. Exactly what it was, I don't remember. I just can't remember that far back or just the details because I handled an awful lot of loans, made a lot of inspections all over the County and I can't pick up every time."

He stated that there were ten persons working for Loyola at the time who made inspections.

*Equity Jurisdiction*

The appellants argue strenuously that equity has long had exclusive jurisdiction over trusts. Their argument is well supported by the authorities. The Restatement (Second) of Trusts (1959) states:

§ 197 — "Except as stated in § 198, the remedies of the beneficiary against the trustee are exclusively equitable."

§ 198 — "(1) If the trustee is under a duty to pay money immediately and unconditionally to the beneficiary, the beneficiary can maintain an action at law against the trustee to enforce payment.

(2) If the trustee of a chattel is under a duty to transfer it immediately and unconditionally to the beneficiary and in breech of trust fails to transfer it, the beneficiary can maintain an action at law against him."

The official comment to this section states:

"(e) *Liability to pay damages for breach of trust —* An action at law cannot be maintained against a

trustee for damages for a breach of trust as distinguished from an indebtedness arising out of a breach of trust. Thus, if the trustee negligently injures or destroys the subject matter of a trust, other than money, he is not liable in an action at law."

To the same effect *see* Bogert, *Trusts and Trustees* (2d. Ed.), §§ 867, 870. The Maryland cases support these texts. In the early case of *Nelson v. Howard*, 5 Md. 327 (1854), the Court held that a trustee could be proceeded against in law after the trustee had stated his account and there was a liquidated sum shown to be due the plaintiff in which the Court said at 331, 332:

"There can be no doubt in this State as to the principles of law which must govern the decision of this case. It is unquestionably true, that to enable the plaintiff to recover in this action, he must show that there had been an adjustment of the accounts between the parties and a promise to pay the amount ascertained to be due. Unless he can do this he has no standing in a court of *law*. On the other hand, if he can make out these facts, there is no difficulty in regard to the jurisdiction of a court of law. So long as the amount of indebtedness was undecided and an absence of a promise to pay, the matter remained one only cognizable by a court of equity; but whenever these facts are established as between the parties, a paramount legal title results to the promise, which enables him to proceed in a court of law."

In *Cockey v. Leister*, 12 Md. 124 (1858), the Court carefully distinguished *Nelson, supra,* in a case where the liability in a liquidated amount had not been shown:

"In *Nelson v. Howard*, 5 Md. 327, a suit at law was maintained against the executor of a trustee, but the trust had been closed, and the trustee had promised to pay an ascertained balance due the *cestui que trust*.

"It follows, from the views here expressed, that the court erred in granting the plaintiff's prayer, because there was no evidence to show that the defendant was liable in the attachment—the proof offered having had relation only to his possession of funds as trustee — and, as to the defendant's prayers, if he was liable as garnishee, he was only chargeable to the extent of Nicholas Leister's interest, as ascertained in equity, and this had not been determined." *Id.* at 131, 132.

Although there are many recent cases which indicate that equity courts have jurisdiction over trusts, we have found no recent case which spells out so clearly that the jurisdiction in equity is exclusive where there is no definite sum shown to be due.[1] *See* for example, *Sullivan v. Mosner,* 266 Md. 479, 295 A. 2d 482 (1972), *Salem Church v. Numsen,* 191 Md. 43, 59 A. 2d 757 (1948); *Ghingher v. O'Connell,* 165 Md. 267, 167 A. 184 (1933). *See also* Maryland Rules V70 through V84, Estates and Trusts Article § 14-101 and § 14-301.

The appellants argue forceably and we think correctly that subjecting trustees to jury findings of liability would discourage persons from accepting such responsibilities and would doubtless make it more difficult to obtain trustees to execute trusts. We note in the instant case, however, that Loyola was not a trustee. The trust agreement recited that it was made for Loyola's and the owner's benefit but the trustees were Messrs. Jones and Weaver. Loyola's liability is predicated upon different grounds; i.e., what occurred after the funds were transferred to the Galaneses. *See* Restatement (Second) of Trusts § 281 (1959).

Appellants argue we cannot consider Loyola's liability separately from that of the trustees because the issue was not so presented to the trial court. We do not see it that way. The appellants moved to transfer the case to a court of equity prior to trial. The trial court ruled that a court of law had jurisdiction. Although we find him in error as to the trustees, we find no error in his holding that

---

[1] We do not consider that the stipulation made the sum definite for the purpose of considering jurisdiction of the law court.

Loyola was subject to a suit at law. A trial judge can be right for the wrong reason. *Robinson v. State,* 17 Md. App. 451, 302 A.2d 659 (1973), *Jones v. Endslow,* 23 Md. App. 578, 328 A. 2d 339 (1974).

## Sufficiency of the Evidence

Appellants contend that their motion for a directed verdict or for a judgment N.O.V. should have been granted. Initially, we point out that in reviewing the evidence we must assume the truth of all evidence which tends to support the verdict. *Smith v. Bernfeld,* 226 Md. 400, 174 A. 2d 53 (1961). And, of course, the motion should be denied if there is any legally relevant and competent evidence, however slight, to support the verdict. *Jacobson v. Julian,* 246 Md. 549, 229 A. 2d 108 (1967). The appellants argue that the evidence fails to show the trustees' actions resulted from an act committed in bad faith or intentionally or "with reckless indifference to the interest of the beneficiary." Restatement (Second) of Trusts § 222, comment (a); or that under *Sullivan v. Mosner, supra,* the appellants' conduct should be decided in accordance with paragraph 6 of the agreement which provides:

> "6. That the Trustees shall not be held liable for any loss to the funds deposited with them unless such loss be caused by their or either of their personal gross neglect or willful malfeasance."

Assuming without deciding Loyola, not a trustee, would be governed by the same principles which determine the liability of a trustee, we think the evidence amply supports the jury finding that Loyola's conduct was in bad faith,[2] intentional, or recklessly indifferent to the interest of the Galaneses.

There was evidence from Mr. Will, whose testimony appeared evasive, that he was a long-time business acquaintance of Mr. Henderson, the moving factor in the

---

2. The jury was instructed the plaintiffs (appellees) could not recover unless the defendants (appellants) were guilty of bad faith in making the inspections.

relationship of King Brook Builders with Loyola. There was some evidence that Mr. Will was aware that the building corporation was in some financial difficulty when he advised Mrs. Galanes that she had to endorse the check so that the builder would have money to put a roof on the house across the street and thus get money to complete her house. It is stipulated the house was not completed at the time of Mr. Will's final inspection of the property.[3] There was testimony that Mr. Will used threats of foreclosure to coerce the appellees into endorsing checks which Loyola had already delivered to the builder directly, without any authorization from the Galaneses. Will, himself, testified that he had no authority to make this statement and in fact had nothing to do with initiating foreclosure proceedings. Mrs. Galanes testified that the appellees endorsed the checks over to the builder only because of these statements from Loyola. We think the Galaneses had the right to rely on these statements of their lender, who had apparently assumed all of the duties of the trustees. Under the circumstances, we think Mr. Will's representations that Loyola would foreclose, knowing as he did that the various stages of construction were not completed, could be found to be fraudulent. An action for fraud can be predicated on statements which are expressions promissory in nature, if there is no present intention to keep the promise. *Levin v. Singer,* 227 Md. 47, 63, 175 A. 2d 423 (1961).

> *Judgment affirmed as to Loyola Federal Savings and Loan Association.*
> *Judgment reversed as to James H. Jones and Calvin T. Weaver.*
> *Loyola to pay costs.*

---

**3.** Mr. Will, in his testimony, did not recall making the final inspection. The signature on the final report, however, appears to be identical with those on the first two reports which were admittedly Mr. Will's.