THRIFTY DIVERSIFIED, INC. *v.* THOMAS R. SEARLES

[No. 1233, September Term, 1980.]

*Decided May 8, 1981.*

The cause was argued before GILBERT, C. J., and THOMPSON and MOYLAN, JJ.

*Anthony L. Brennan* for appellant.

*Joseph F. Lavin* and *Edward C. Mackie,* with whom were *Robert W. Fox* and *Rollins, Smalkin, Weston, Richards & Mackie* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The world has come a long way since the day of the Yankee horse trader, the Arab bazaar and unfettered laissez-faire economics. A modern-day consumer, unlike his earlier counterpart, is entitled to more than the callous admonition "caveat emptor." This case helps to illustrate why this should be so.

In late August, 1976, Thomas R. Searles, the appellee, and his family were planning to leave for a one-week vacation in Ocean City, Maryland. Mr. Searles intended to drive to Ocean City in his 1971 Chevrolet station wagon. At that time, the automobile had approximately 73,000 to 75,000 miles on the odometer. Since the transmission oil had not been changed in approximately the last 23,000 to 25,000 miles, Mr. Searles decided that it would be wise to have the oil changed and a new filter installed. He sought to take advantage of an advertisement in the newspaper in which the appellant, Thrifty Diversified, Inc., d/b/a Bill & Earl's Automotive Service Centers, offered a transmission service special for $12.95. On Thursday, August 26, Mr. Searles called Bill & Earl's and was told to bring the car into the shop — that they would do the work "right away." When he arrived at the shop, however, he was told that the work could not be done that day and to return the next morning.

Mr. Searles returned to Bill & Earl's on Friday morning. He was then told by one of the appellant's employees that his car would have to be test-driven before any work could be done. Mr. Searles said that he would like to go on the test drive. After waiting around for half an hour, however, he suddenly noticed his car being driven around the corner

without him. When the appellant's employee returned from the test drive, Mr. Searles was told that although the car "shifts fine," there might be a little slippage in the transmission and that they would have to "drop the pan" to find what was causing the problem. Since the employee could not estimate how long that would take, Mr. Searles went home.

Mr. Searles was home no more than fifteen minutes when he received a call from a Tom Bloom at Bill & Earl's telling him he had problems with the transmission — that there were big chunks of metal in the pan. Mr. Searles expressed surprise that there could be big chunks of metal in the pan when the car had been running perfectly. Mr. Bloom told him that they would have to drop the transmission and take it apart to determine from where the metal chunks were coming. Mr. Searles told him not to do anything until he saw the chunks. He went immediately to the shop.

When Mr. Searles arrived at the shop, his car was on the lift, and the pan was still on the transmission. He told Mr. Bloom he wanted to see the metal chunks. Mr. Bloom said it would take about twenty minutes to get the pan off and another hour to take the transmission apart. Mr. Searles specifically told Mr. Bloom not to take the transmission out of the car — that he had no intention of spending any money for a new transmission on an old car. He told him, however, to take the pan off so that he could see the metal chunks. Mr. Searles then left the shop to get something to eat.

When Mr. Searles returned twenty minutes or a half-hour later, the transmission was out of his car and was completely apart. There were parts on a workbench and on the floor of the shop. Mr. Searles had no way of knowing whether the parts were from his car or somebody else's automobile. A man who appeared to be the supervisor of the shop told Mr. Searles that the transmission was "all burnt out." Mr. Searles asked how it could be "burnt out" when the car was running perfectly. Although Mr. Searles originally had no intention of putting a rebuilt transmission into his car, at that point he felt he had no choice. He was planning to leave for his vacation the next day and needed the car that afternoon. He

inquired what it would cost to have the car repaired. He was told that he could have his old transmission repaired at a cost of $271 or could purchase a rebuilt transmission from appellant's stock, with a guarantee of one year or 12,000 miles, at a cost of $331. Mr. Searles chose to have a rebuilt transmission installed when appellant's employee told him it would take three days to repair his own transmission but a rebuilt transmission could be installed that afternoon. While writing up the work order, Mr. Bloom told Mr. Searles that since the transmission was burned up, he needed a cooler on it. Mr. Searles told him that he did not pull trailers and that if the car needed an extra cooler it would have had one installed by the manufacturer. With that, Mr. Bloom dropped the subject. Mr. Searles was told to return for his car around 5:30 P.M.

When Mr. Searles returned to the shop around 5:30 that afternoon, there were few people in the shop and the car was still on the lift. He was told that they had trouble with the car and that since they were closed on Saturday he would have to check with them on Monday. Mr. Searles did not go to Ocean City on Saturday. Instead, he waited until Monday, when he again called Bill & Earl's. He was told the car would be ready at 10:30 A.M. When he arrived at the shop to pick up the car, however, he was told they were still having problems with it and were going to have to take the unit out again. Mr. Searles decided not to wait any longer. He left immediately for Ocean City in another car.

Mr. Searles returned from his vacation the following weekend. The shop was closed through Monday, Labor Day. Mr. Searles called Bill & Earl's Tuesday morning, September 7. He was told to pick up his car. The cost of the work was $353.89 [1] — over $20.00 more than the original estimate. Tom Bloom explained that the additional amount was for a motor mount. Mr. Searles did not argue with him but paid the bill by check. He took the car home and parked it in his garage.

---

1. The bill broke down into $264.50 for the rebuilt transmission (designated as Unit #15710-4 from appellant's stock); $9.97 for the motor mount; $57.00 for labor; $11.00 for transmission fluid; and $11.42 for tax.

Late that evening, Mr. Searles' wife noticed hydraulic fluid all over the garage floor. Mr. Searles decided to take the car back to Bill & Earl's. When he looked at his receipt, however, he discovered that it was stamped "NO GUARANTEE." He inquired why this was so stamped and was told that because he did not have a cooler or clutch fan installed, Bill & Earl's could not guarantee the transmission. He immediately stopped payment on his check and contacted the Attorney General's Office. He subsequently took his car to Marsden Chevrolet for repair. Marsden charged Mr. Searles $88.00 to repair the transmission leak. The leak had been caused by the improper installation of the front pump by Bill & Earl's, resulting in a slip or distorting of an o-ring gasket.

While the car was on the lift at Marsden, Mr. Searles discovered that the transmission in his car was in fact his original transmission and not a rebuilt one. Since 1969 domestic manufacturers of automobiles in the United States have put a serial number on the transmission casing corresponding to the serial number on the car. The mechanic who worked on Mr. Searles' car at Marsden and Peter Lopes, an investigator with the Consumer Protection Division of the Attorney General's Office, verified that the number on the transmission matched the serial number of the vehicle.

As a result, Mr. Searles brought suit in the Circuit Court for Baltimore County against Thrifty Diversified, Inc. on two counts — one alleging fraud and the other conversion in the repair of his automatic transmission. The case was tried before a jury. At the conclusion of the plaintiff's case, the trial judge directed a verdict in favor of the defendant on the conversion count. The defendant's motion for a directed verdict on the fraud count was denied, and the case was submitted to the jury. The jury returned a verdict in favor of Mr. Searles in the amount of $88.00 compensatory damages and $20,000.00 punitive damages. Following the denial of its motion for a new trial or, in the alternative, judgment n.o.v., Thrifty noted this appeal.

On this appeal, the appellant, Thrifty, raises the following contentions:

1) That the evidence was not legally sufficient to support a finding that the appellant made a material misrepresentation of fact;

2) That there was no legally sufficient evidence of any actual damage caused by the alleged fraud;

3) That the trial court erred in refusing to instruct the jury as to the "missing evidence rule" and as to the definition of a "rebuilt" or "remanufactured" transmission;

4) That the trial court erred in denying appellant's motions for a mistrial and a new trial;

5) That the trial court erred in permitting appellee to introduce certain rebuttal testimony;

6) That the trial court erred in refusing to frame special issues for submission to the jury; and

7) That the trial court erred in ruling that recovery here was not barred by an election of remedies.

## I. THE LEGAL SUFFICIENCY OF THE EVIDENCE TO SHOW A MATERIAL MISREPRESENTATION OF FACT

In addressing this contention, the appellant goes to great lengths to point out, and the appellee candidly acknowledges, that the burden of persuasion in a case of fraud is that of "clear and convincing proof" rather than that of "a mere preponderance of the evidence." There is no disputing that well-settled principle, *Whittington v. State,* 8 Md. App. 676, 679, 262 A.2d 75 (1970), but the legal proposition is beside the point when we are dealing with the question of legal sufficiency. The burden of persuasion deals with the degree to which a factfinder should be convinced before he renders a verdict on a particular issue. Legal questions about the appropriate burden of persuasion will generally arise in the context of a judge's instructions to the jurors, as he tries to describe for them that degree of certainty which they should

feel in order to decide a particular question. The ultimate weight to be given to the evidence, however, is in the unfettered prerogative of the factfinders themselves, provided only that there be some competent evidence as to each required element which, *if believed,* would be capable of establishing that element. Once the burden of production (as distinguished from the burden of persuasion) has been met, however, the same *prima facie* case (which is all that legal sufficiency deals with) that may persuade one factfinder a little bit may persuade a second factfinder overwhelmingly and yet fail to persuade a third factfinder at all. The question of the applicable burden of persuasion is completely divorced from the question of the legal sufficiency of the evidence to establish a *prima facie* case. Once again, the burden of persuasion deals only with the advice given to the jury by the judge (in a jury case) as to how significantly their minds should tilt in one direction or another and (though shielded from the scrutiny of review) the extent to which the factfinders (judge or jury) follow such advice. The point is that the decision as to what the burden of persuasion in a particular case or on a particular issue may be has quite obviously a great impact upon whether the burden of persuasion ultimately is carried by the proponent. It has no **effect whatsoever on the very distinct question of whether the proponent meets the burden of production. Thus, the** self-evident principle that the burden of persuasion in this case was that of "clear and convincing evidence" has nothing at all to do with the question of legal sufficiency, which question we shall now address.

There were in this case two alleged misrepresentations of material facts, either one of which could have served as the predicate for this fraud action. The first was that the appellee's transmission was in need of repairs when in fact it was not. The second, as an alternative basis for recovery, was that the appellant was installing a rebuilt transmission from its stock when in fact all it did was to reinstall Mr. Searles' own original transmission. Although there was a great deal of evidence from various sources to establish that both of these representations were made, that both were

false and known to be false, and that Mr. Searles relied upon them to his ultimate detriment, the thrust of the appellant's argument in this regard is that the plaintiff's key witness was the plaintiff himself. From that predicate, the appellant looks to the New Jersey decision of *DeBlanco v. Dooley,* 395 A.2d 909 (N.J. Super., 1978), which holds, according to the appellant, that:

"The unsupported testimony of an interested party does not constitute clear and convincing evidence."

Our response to this argument is twofold. The first is that the appellant misreads, to his own advantage, the New Jersey decision. What it actually says, at 395 A.2d 911, is:

"* * * the unsupported testimony of an interested party, such as plaintiff here, that a check *made payable to a corporation* was actually a *loan to an individual,* simply does not meet [the clear and convincing] standard." (Emphasis supplied.)

Thus, even the New Jersey decision does not stand for a blanket proposition of law that the testimony of an interested party requires support or corroboration as a matter of law.

Even if the New Jersey law were otherwise, however, it would make no difference in Maryland. The Maryland law is settled that (absent some special requirement not here pertinent) the testimony of a party does not need corroboration in order to be legally sufficient — to meet the production burden, to establish the *prima facie* case required to get to the factfinder. All that is required is that the factfinder believe the evidence (even when it emanates from an interested party) and be persuaded by such evidence clearly and convincingly, which the factfinder is entitled to do in its unfettered discretion once the case is legitimately entrusted to it. *Impala Platinum Limited v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 328, 389 A.2d 887 (1978); *First National Bank of Southern Maryland v. United States Fidelity and Guaranty Company,* 275 Md. 400, 411, 340 A.2d 275 (1975); *Peurifoy v. Congressional Motors, Inc.,* 254 Md.

501, 517, 255 A.2d 332 (1969); *Bachrach v. Washington United Cooperative, Inc.,* 181 Md. 315, 321, 29 A.2d 822 (1943); *Fuller v. Horvath,* 42 Md. App. 671, 402 A.2d 134 (1979); and *Loyola Federal Savings and Loan Association v. Galanes,* 33 Md. App. 559, 568, 365 A.2d 580 (1976).

## II. THE LEGAL SUFFICIENCY OF THE EVIDENCE TO SHOW DAMAGES

The appellant claims that the evidence was not legally sufficient to show damages and that, therefore, the trial judge erred in failing to direct a verdict in its favor and subsequently erred again by failing to grant a judgment n.o.v. in its favor. The point is without merit.

Quite aside from such very real but not easily quantifiable injury as the shameful wastage of Mr. Searles' time on occasion after occasion, the loss of approximately 25% of a planned family vacation, the necessity to provide alternative means of transportation to Ocean City and the attendant psychic traumata of anger, irritation, resentment and frustration, there was direct evidence that the appellee was required to take his automobile to Marsden Chevrolet to repair a leak to the transmission which had been caused by the improper installation of the transmission by the appellant. This repair cost $88.00. The appellant strains to persuade us that the slipping or distorting of an o-ring gasket is not an uncommon occurrence in the transmission rebuilding trade and was not a direct effect of fraudulent misrepresentation. The appellant's thesis runs that such faulty installation could just as easily have occurred in installing a rebuilt transmission from stock as in the fraudulent reinstalling of the appellee's own transmission. Once again, our response is twofold. The appellant overlooks the well-settled principle of law that one may not plead his own negligent act as the "intervening cause" which enables him to escape the consequences of his own prior wrongdoing. *Mullan v. Hacker,* 187 Md. 261, 269-70, 49 A.2d 640 (1946); *Lashley v. Dawson,* 162 Md. 549, 563, 160 A. 738 (1932); and *State, Use of Scott v. Washington, Baltimore and Annapolis*

*Electric Railroad Company,* 130 Md. 603, 611, 101 A. 546 (1917).

The appellant, moreover, overlooks the predominant theory of fraud that Mr. Searles, in responding to an attractive advertisement for very routine maintenance, was fraudulently gulled into this entire episode and that the negligent causing of the leak would never have occurred but for the unnecessary removal and installation (or reinstallation) of any transmission at all.

## III. JURY NON-INSTRUCTIONS

The appellant claims that the trial judge erred in failing to give two different requested instructions. They were both related. The appellant argued for a tortured and technical definition, drawn from rulings of the Federal Trade Commission, as to the meaning of "rebuilt" or "remanufactured" as distinguished from "repaired." In that same vein, the appellant urged that even if Mr. Searles' own transmission had been reinstalled, it had been sufficiently remanufactured and supplied with new components to remove any shadow of fraud. The appellant urges that the jury should have been instructed that the failure of the appellee to call witnesses as to the state of his transmission after reinstallation would properly give rise to a presumption, under the missing witness rule theory, that such missing testimony would have been detrimental to the appellee's cause.

We agree with the appellee that the primary theory of fraud in this case, amply supported by the evidence, is that Mr. Searles' transmission was not in need of any repair whatsoever even in the first instance. Any work done on the transmission was, therefore, unnecessary work and technical distinctions as to the nature and extent of such unnecessary work are quite irrelevant.

## IV. THE FAILURE TO DECLARE A MISTRIAL

## V. THE ADMISSION OF REBUTTAL TESTIMONY

## VI. THE REFUSAL TO FRAME SPECIAL ISSUES

The appellant's remaining contentions will not detain us long. Indeed, the fourth, fifth and sixth contentions all deal with discretionary acts on the part of the trial judge. The law could not be more clear that wide discretion is vested in the trial judge to control the course of the trial and the exercise of such discretion will not be reversed on appellant review except in those rare cases where there has been a clear abuse of that discretion. *Brooks v. Daley,* 242 Md. 185, 196-7, 218 A.2d 184 (1966).

The appellant urges that his motion for a mistrial should have been granted when several references intruded into the case, primarily from the mouth of a representative of the Attorney General's Office who quite properly testified as to his examination of the serial number of the transmission and his comparison of that with the serial number of Mr. Searles' automobile, to the effect that the Attorney General's Office had investigated the business activities of the appellant. The trial judge ruled that a curative instruction would suffice and that a mistrial was hardly called for. We see no abuse of discretion in this regard. *Nelson v. Seiler,* 154 Md. 63, 72, 139 A. 564 (1927).

The appellant also urges that the trial judge abused his discretion when he permitted the two sons of Mr. Searles', age 10 and 14 years, to testify on rebuttal as to what they saw when they accompanied their father to the appellant's place of business on August 27 and again on September 6. The appellant urges that this testimony was simply cumulative and was not, therefore, proper rebuttal. The trial judge ruled, on the other hand, that it did contradict the evidence offered by the appellant. Once again, it is not ours to second-guess and we see no clear abuse of discretion here. *Riffey v. Tonder,* 36 Md. App. 633, 645-6, 375 A.2d 1138 (1977).

The final discretionary act to which the appellant takes umbrage was the failure of the trial judge to frame special issues for submission to the jury. This was not a case involving a multiplicity of parties defendant or a multiplicity of theories of liability and we cannot say that

the failure of the trial judge here to frame special issues constituted a clear abuse of discretion. *Food Fair Stores, Inc. v. Lascola,* 31 Md. App. 153, 165, 355 A.2d 757 (1976); *Sun Cab Company, Inc. v. Walston,* 15 Md. App. 113, 161, 289 A.2d 804 (1972).

## VII. THE ELECTION OF REMEDIES

The appellant's final contention is an exercise in sophistry. He urges that, on the authority of *Nelley v. Mayor & City Council of Baltimore,* 224 Md. 1, 166 A.2d 234 (1960), the appellee had an election of remedies either to affirm the contract and sue for damages or to repudiate the contract. He urges further that by stopping payment on the check, the appellee effectively repudiated the contract and has thereby achieved all that he could have hoped to achieve under that election. He conveniently ignores the fact that the appellee here sued not on the contract but on the fraud, which he might do even if he had revoked the contract. *Shoreham Developers, Inc. v. Randolph Hills, Inc.,* 269 Md. 291, 299, 301, 305 A.2d 465 (1973). Nor can we buy the appellant's theory that by stopping payment on the check, the appellee *ipso facto* repudiated the contract. He was not, as the appellant urges, effectively restored to his *status quo ante* simply because he stopped payment on the check. He still had a leaky transmission which he had not had before this entire disgraceful episode began. Quite aside from all of his other travail, the leaky transmission cost him $88.00 to repair. The stopping of the payment on the check to the appellant did not in any way cover that repair bill.

*Judgment affirmed; costs to be paid by appellant.*